# Exhibit K

# FTC POLICY STATEMENT ON DECEPTION
Appended to <u>Cliffdale Associates, Inc.</u>, 103 F.T.C. 110, 174 (1984).

FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

October 14, 1983

The Honorable John D. Dingell
Chairman
Committee on Energy and Commerce
U.S. House of Representatives
Washington, D.C. 20515

Dear Mr. Chairman:

This letter responds to the Committee's inquiry regarding the Commission's enforcement policy against deceptive acts or practices.[1] We also hope this letter will provide guidance to the public.

Section 5 of the FTC Act declares unfair or deceptive acts or practices unlawful. Section 12 specifically prohibits false ads likely to induce the purchase of food, drugs, devices or cosmetics. Section 15 defines a false ad for purposes of Section 12 as one which is "misleading in a material respect."[2] Numerous Commission and judicial decisions have defined and elaborated on the phrase "deceptive acts or practices" under both Sections 5 and 12. Nowhere, however, is there a single definitive statement of the Commission's view of its authority. The Commission believes that such a statement would be useful to the public, as well as the Committee in its continuing review of our jurisdiction.

We have therefore reviewed the decided cases to synthesize the most important principles of general applicability. We have attempted to provide a concrete indication of the manner in which the Commission will enforce its deception mandate. In so doing, we intend to address the concerns that have been raised about the meaning of deception, and thereby attempt to provide a greater sense of certainty as to how the concept will be applied.[3]

## I. SUMMARY

Certain elements undergird all deception cases. First, there must be a representation, omission or practice that is likely to mislead the consumer.[4] Practices that have been found misleading or deceptive in specific cases include false oral or written representations, misleading price claims, sales of hazardous or systematically defective products or services without adequate disclosures, failure to disclose information regarding pyramid sales, use of bait and switch techniques, failure to perform

promised services, and failure to meet warranty obligations.[5]

*Second*, we examine the practice from the perspective of a consumer acting reasonably in the circumstances. If the representation or practice affects or is directed primarily to a particular group, the Commission examines reasonableness from the perspective of that group.

*Third*, the representation, omission, or practice must be a "material" one. The basic question is whether the act or practice is likely to affect the consumer's conduct or decision with regard to a product or service. If so, the practice is material, and consumer injury is likely, because consumers are likely to have chosen differently but for the deception. In many instances, materiality, and hence injury, can be presumed from the nature of the practice. In other instances, evidence of materiality may be necessary.

Thus, the Commission will find deception if there is a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment. We discuss each of these elements below.

II. THERE MUST BE A REPRESENTATION, OMISSION, OR PRACTICE THAT IS LIKELY TO MISLEAD THE CONSUMER.

Most deception involves written or oral misrepresentations, or omissions of material information. Deception may also occur in other forms of conduct associated with a sales transaction. The entire advertisement, transaction or course of dealing will be considered. The issue is whether the act or practice is likely to mislead, rather than whether it causes actual deceptions.

Of course, the Commission must find that a representation, omission, or practice occurred in cases of express claims, the representation itself establishes the meaning. In cases of implied claims, the Commission will often be able to determine meaning through an examination of the representation itself, including an evaluation of such factors as the entire document, the juxtaposition of various phrases in the document, the nature of the claim, and the nature of the transactions.[7] In other situations, the Commission will require extrinsic evidence that reasonable consumers reach the implied claims.[8] In all instances, the Commission will carefully consider any extrinsic evidence that is introduced.

Some cases involve omission of material information, the disclosure of which is necessary to prevent the claim, practice, or sale from being misleading.[9] Information may be omitted from written[10] or oral[11] representations or from the commercial transaction.[12]

In some circumstances, the Commission can presume that consumers are likely to reach false beliefs about the product or service because of an omission. At other times, however, the Commission may require evidence on consumers' expectations.[13]

Marketing and point-of-sales practices that are likely to mislead consumers are also deceptive. For instance, in bait and switch cases, a violation occurs when the offer to sell the product is not a bona fide offer.[14] The Commission has also found deception where a sales representative misrepresented the purpose of the initial contact with customers.[15] When a product is sold, there is an implied representation that the product is fit for the purposes for which it is sold. When it is not, deception occurs.[16] There may be a concern about the way a product or service is marketed, such as where inaccurate or incomplete information is provided.[17] A failure to perform services promised under a warranty or by contract can also be deceptive.[18]

### III. THE ACT OR PRACTICE MUST BE CONSIDERED FROM THE PERSPECTIVE OF THE REASONABLE CONSUMER

The Commission believes that to be deceptive the representation, omission or practice must be likely to mislead reasonable consumers under the circumstances.[19] The test is whether the consumer's interpretation or reaction is reasonable.[20] When representations or sales practices are targeted to a specific audience, the Commission determines the effect of the practice on a reasonable member of that group. In evaluating a particular practice, the Commission considers the totality of the practice in determining how reasonable consumers are likely to respond.

A company is not liable for every interpretation or action by a consumer. In an advertising context, this principle has been well-stated:

> An advertiser cannot be charged with liability with respect to every conceivable misconception, however outlandish, to which his representations might be subject among the foolish or feeble-minded. Some people, because of ignorance or incomprehension, may be misled by even a scrupulously honest claim. Perhaps a few misguided souls believe, for example, that all "Danish pastry" is made in Denmark. Is it therefore an actionable deception to advertise "Danish pastry" when it is made in this country.? Of course not, A representation does not become "false and deceptive" merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed. Heinz W. Kirchner, 63 F.T.C. 1282, 1290 (1963).

To be considered reasonable, the interpretation or reaction does not have to be the only one.[21] When a seller's representation conveys more than one meaning to reasonable consumers, one of which is false, the seller is liable for the misleading interpretation.[22] An interpretation will be presumed reasonable if it is the one the respondent intended to convey.

The Commission has used this standard in its past decisions. The test applied by the Commission is whether the interpretation is reasonable in light of the claim."[23] In the Listerine case, the Commission evaluated the claim from the perspective of the "average listener."[24] In a case involving the sale of

encyclopedias, the Commission observed "[i]n determining the meaning of an advertisement, a piece of promotional material or a sales presentation, the important criterion is the net impression that it is likely to make on the general populace."[25] The decisions in American Home Products, Bristol Myers, and Sterling Drug are replete with references to reasonable consumer interpretations.[26] In a land sales case, the Commission evaluated the oral statements and written representations "in light of the sophistication and understanding of the persons to whom they were directed."[27] Omission cases are no different: the Commission examines the failure to disclose in light of expectations and understandings of the typical buyer[28] regarding the claims made.

When representations or sales practices are targeted to a specific audience, such as children, the elderly, or the terminally ill, the Commission determines the effect of the practice on a reasonable member of that group.[29] For instance, if a company markets a cure to the terminally ill, the practice will be evaluated from the perspective of how it affects the ordinary member of that group. Thus, terminally ill consumers might be particularly susceptible to exaggerated cure claims. By the same token, a practice or representation directed to a well-educated group, such as a prescription drug advertisement to doctors, would be judged in light of the knowledge and sophistication of that group.[30]

As it has in the past, the Commission will evaluate the entire advertisement, transaction, or course of dealing in determining how reasonable consumers are likely to respond. Thus, in advertising the Commission will examine "the entire mosaic, rather than each tile separately."[31] As explained by a court of appeals in a recent case:

> The Commission's right to scrutinize the visual and aural imagery of advertisements follows from the principle that the Commission looks to the impression made by the advertisements as a whole. Without this mode of examination, the Commission would have limited recourse against crafty advertisers whose deceptive messages were conveyed by means other than, or in addition to, spoken words. American Home Products, 695 F.2d 681, 688 (3d Cir. Dec. 3, 1982).[32]

In a case involving a weight loss product, the Commission observed:

> It is obvious that dieting is the conventional method of losing weight. But it is equally obvious that many people who need or want to lose weight regard dieting as bitter medicine. To these corpulent consumers the promises of weight loss without dieting are the Siren's call, and advertising that heralds unrestrained consumption while muting the inevitable need for temperance, if not abstinence, simply does not pass muster. Porter & Dietsch, 90 F.T.C. 770, 864-865 (1977), 605 F.2d 294 (7th Cir. 1979), cert. denied, 445 U.S. 950 (1980).

Children have also been the specific target of ads or practices. In *Ideal Toy*, the Commission adopted the Hearing Examiner's conclusion that:

> False, misleading and deceptive advertising claims beamed at children tend to exploit unfairly a consumer group unqualified by age or experience to anticipate or appreciate the possibility that representations may he exaggerated or untrue. *Ideal Toy*, 64 F.T.C. 297, 310 (1964).

See also, *Avalon Industries Inc.*, 83 F.T.C. 1728, 1750 (1974).

In a subsequent case, the Commission explained that "[i]n evaluating advertising representations, we are required to look at the complete advertisement and formulate our opinions on them on the basis of the net general impression conveyed by them and not on isolated excerpts." *Standard Oil of Calif*, 84 F.T.C. 1401, 1471 (1974), *aff'd as modified*, 577 F.2d 653 (9th Cir. 1978), *reissued*, 96 F.T.C. 380 (1980).

The Third Circuit stated succinctly the Commission's standard. "The tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context." *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976), *cert denied*, 430 U.S. 983 (1977).

Commission cases reveal specific guidelines. Depending on the circumstances, accurate information in the text may not remedy a false headline because reasonable consumers may glance only at the headline.[33] Written disclosures or fine print may be insufficient to correct a misleading representations.[34] Other practices of the company may direct consumers' attention away from the qualifying disclosures.[35] Oral statements, label disclosures or point-of-sale material will not necessarily correct a deceptive representation or omission.[36] Thus, when the first contact between a seller and a buyer occurs through a deceptive practice, the law may be violated even if the truth is subsequently made known to the purchaser.[37] Pro forma statements or disclaimers may not cure otherwise deceptive messages or practices.[38]

Qualifying disclosures must be legible and understandable. In evaluating such disclosures, the Commission recognizes that in many circumstances, reasonable consumers do not read the entirety of an ad or are directed away from the importance of the qualifying phrase by the acts or statements of the seller. Disclosures that conform to the Commission's Statement of Enforcement Policy regarding clear and conspicuous disclosures, which applies to television advertising, are generally adequate, CCH Trade Regulation Reporter, ¶ 7569.09 (Oct. 21, 1970). Less elaborate disclosures may also suffice.[39]

Certain practices, however, are unlikely to deceive consumers acting reasonably. Thus, the Commission generally will not bring advertising cases based on subjective claims (taste, feel, appearance, smell) or on correctly stated opinion claims if consumers understand the source and limitations of the opinion.[40] Claims phrased as opinions are actionable, however, if they are not

honestly held, if they misrepresent the qualifications of the holder or the basis of his opinion or if the recipient reasonably interprets them as implied statements of fact.[41]

The Commission generally will not pursue cases involving obviously exaggerated or puffing representations, *i.e.*, those that the ordinary consumers do not take seriously.[42] Some exaggerated claims, however, may be taken seriously by consumers and are actionable. For instance, in rejecting a respondent's argument that use of the words "electronic miracle" to describe a television antenna was puffery, the Commission stated:

Although not insensitive to respondent's concern that the term miracle is commonly used in situations short of changing water into wine, we must conclude that the use of "electronic miracle" in the context of respondent's grossly exaggerated claims would lead consumers to give added credence to the overall suggestion that this device is superior to other types of antennae. *Jay Norris*, 91 F.T.C. 751, 847 n.20 (1978), *aff'd*, 598 F.2d 1244 (2d Cir.), *cert. denied*, 444 U.S. 980 (1979).

Finally, as a matter of policy, when consumers can easily evaluate the product or service, it is inexpensive, and it is frequently purchased, the Commission will examine the practice closely before issuing a complaint based on deception. There is little incentive for sellers to misrepresent (either by an explicit false statement or a deliberate false implied statement) in these circumstances since they normally would seek to encourage repeat purchases. Where, as here, market incentives place strong constraints on the likelihood of deception, the Commission will examine a practice closely before proceeding.

In sum, the Commission will consider many factors in determining the reaction of the ordinary consumer to a claim or practice. As would any trier of fact, the Commission will evaluate the totality of the ad or the practice and ask questions such as: how clear is the representation? how conspicuous is any qualifying information? how important is the omitted information? do other sources for the omitted information exist? how familiar is the public with the product or service?[43]

## IV. THE REPRESENTATION, OMISSION OR PRACTICE MUST BE MATERIAL

The third element of deception is materiality. That is, a representation, omission or practice must be a material one for deception to occur.[44] A "material" misrepresentation or practice is one which is likely to affect a consumer's choice of or conduct regarding a product.[45] In other words, it is information that is important to consumers. If inaccurate or omitted information is material, injury is likely.[46]

The Commission considers certain categories of information presumptively material.[47] First, the Commission presumes that express claims are material.[48] As the Supreme Court stated recently, "[i]n the absence of factors that would distort the decision to advertise, we may assume that the willingness of a business to promote its products reflects a belief that consumers are interested in the advertising."[49] Where the seller knew, or should have known, that an ordinary consumer would need

omitted information to evaluate the product or service, or that the claim was false, materiality will be presumed because the manufacturer intended the information or omission to have an effect.[50] Similarly, when evidence exists that a seller intended to make an implied claim, the Commission will infer materiality.[51]

The Commission also considers claims or omissions material if they significantly involve health, safety, or other areas with which the reasonable consumer would be concerned. Depending on the facts, information pertaining to the central characteristics of the product or service will be presumed material. Information has been found material where it concerns the purpose,[52] safety,[53] efficacy,[54] or cost,[55] of the product or service. Information is also likely to be material if it concerns durability, performance, warranties or quality. Information pertaining to a finding by another agency regarding the product may also be material.[56]

Where the Commission cannot find materiality based on the above analysis, the Commission may require evidence that the claim or omission is likely to be considered important by consumers. This evidence can be the fact that the product or service with the feature represented costs more than an otherwise comparable product without the feature, a reliable survey of consumers, or credible testimony.[57]

A finding of materiality is also a finding that injury is likely to exist because of the representation, omission, sales practice, or marketing technique. Injury to consumers can take many forms.[58] Injury exists if consumers would have chosen differently but for the deception. If different choices are likely, the claim is material, and injury is likely as well. Thus, injury and materiality are different names for the same concept.

## V. CONCLUSION

The Commission will find an act or practice deceptive if there is a misrepresentation, omission, or other practice, that misleads the consumer acting reasonably in the circumstances, to the consumer's detriment. The Commission will not generally require extrinsic evidence concerning the representations understood by reasonable consumers or the materiality of a challenged claim, but in some instances extrinsic evidence will be necessary.

The Commission intends to enforce the FTC Act vigorously. We will investigate, and prosecute where appropriate, acts or practices that are deceptive. We hope this letter will help provide you and the public with a greater sense of certainty concerning how the Commission will exercise its jurisdiction over deception. Please do not hesitate to call if we can be of any further assistance.

By direction of the Commission, Commissioners Pertschuk and Bailey dissenting, with separate statements attached and with separate response to the Committee's request for a legal analysis to follow.

/s/James C. Miller III
Chairman

cc: Honorable James T. Broyhill
Honorable James J. Florio
Honorable Norman F. Lent

**Endnotes:**

[1] S. Rep. No. 97-451, 97th Cong., 2d Sess. 16; H.R. Rep. No. 98-156, Part I, 98th Cong., 1st Sess. 6 (1983). The Commission's enforcement policy against unfair acts or practices is set forth in a letter to Senators Ford and Danforth, dated December 17, 1980.

[2] In determining whether an ad is misleading, Section 15 requires that the Commission take into account "representations made or suggested" as well as "the extent to which the advertisement fails to reveal facts material in light of such representations or material with respect to consequences which may result from the use of the commodity to which the advertisement relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual." 15 U.S.C. 55. If an act or practice violates Section 12, it also violates Section 5. *Simeon Management Corp.*, 87 F.T.C. 1184, 1219 (1976), *aff'd*, 579 F.2d 1137 (9th Cir. 1978); *Porter & Dietsch*, 90 F.T.C. 770, 873-74 (1977), *aff'd*, 605 P.2d 294 (7th Cir. 1979), *cert. denied*, 445 U.S. 950 (1980).

[3] Chairman Miller has proposed that Section 5 be amended to define deceptive acts. Hearing Before the Subcommittee for Consumers of the Committee on Commerce, Science, and Transportation, United States Senate, 97th Cong., 2d Sess. *FTCs Authority Over Deceptive Advertising*, July 22,1982, Serial No. 97-134, p. 9. Three Commissioners believe a legislative definition is unnecessary. *Id.* at 45 (Commissioner Clanton), at 51 (Commissioner Bailey) and at 76 (Commissioner Pertschuk). Commissioner Douglas supports a statutory definition of deception. Prepared statement by Commissioner George W. Douglas, Hearing Before the Subcommittee for Consumers of the Committee on Commerce, Science and Transportation, United States Senate, 98th Cong. 1st Sess. (March 16, 1983) p. 2.

[4] A misrepresentation is an express or implied statement contrary to fact. A misleading omission occurs when qualifying information necessary to prevent a practice, claim, representation, or reasonable expectation or belief from being misleading is not disclosed. Not all omissions are deceptive, even if providing the information would benefit consumers. As the Commission noted in rejecting a proposed requirement for nutrition disclosures, "In the final analysis, the question whether an advertisement requires affirmative disclosure would depend on the nature and extent of the nutritional claim made in the advertisement.". ITT Continental Baking Co. Inc., 83 F.T.C. 865, 965 (1976). In determining whether an omission is deceptive, the Commission will examine the overall impression created by a practice, claim, or representation. For example, the practice of offering a product for sale creates an implied representation that it is fit for the purposes for which it is sold. Failure to disclose that the product is not fit constitutes a deceptive omission. [See discussion below at 5-6) Omissions may also be deceptive where the representations made are not literally misleading, if those representations create a reasonable expectation or belief among consumers which is misleading, absent the omitted disclosure.

Non-deceptive emissions may still violate Section 5 if they are unfair. For instance, the R-Value Rule, 16 C.F.R. 460.5 (1983), establishes a specific method for testing insulation ability, and requires disclosure of the figure in advertising. The Statement of Basis and Purpose, 44 FR 50,242 (1979), refers to a deception theory to support disclosure requirements when certain misleading claims are made, but the rule's general disclosure requirement is based on an unfairness theory. Consumers could not reasonably avoid injury in selecting insulation because no standard method of measurement existed.

[5] Advertising that lacks a reasonable basis is also deceptive. *Firestone*, 81 F.T.C. 398, 451-52 (1972), *aff'd*, 481 F.2d 246 (6th Cir.), *cert. denied*, 414 U.S. 1112 (1973). *National Dynamics*, 82 F.T.C. 488, 549-50 (1973); *aff'd and remanded on other grounds*, 492 F.2d 1333 (2d Cir.), *cert. denied*, 419 U.S. 993 (1974), *reissued*, 85 F.T.C. 391 (1976). *National Comm'n on Egg Nutrition*, 88 F.T.C. 89, 191 (1976), *aff'd*, 570 P.2d 157 (7th Cir.), *cert. denied*, 439 U.S. 821, *reissued*, 92 F.T.C. 848 (1978). The deception theory is based on the fact that most ads making objective claims imply, and many expressly state, that an advertiser has certain specific grounds for the claims. If the advertiser does not, the consumer is acting under a false impression. The consumer might have perceived the advertising differently had he or she known the advertiser had no basis for the claim. This letter does not address the nuances of the reasonable basis doctrine, which the Commission is currently reviewing. 48 FR 10,471 (March 11, 1983)

[6] In *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976), the court noted "the likelihood or propensity of deception is the criterion by which advertising is measured."

[7] On evaluation of the entire document:

> The Commission finds that many of the challenged Anacin advertisements, when viewed in their entirety, did convey the message that the superiority of this product has been proven [footnote omitted]. It is immaterial that the word "established", which was used in the complaint, generally did not appear in the ads; the important consideration is the net impression conveyed to the public. *American Home Products*, 98 F.T.C. 136, 374 (1981), *aff'd*, 695 F.2d (3d Cir. 1982).

On the juxtaposition of phrases:

> On this label, the statement "Kills Germs By Millions On Contact" immediately precedes the assertion "For General Oral Hygiene Bad Breath, Colds and Resultant Sore Throats" [footnote omitted]. By placing these two statements in close proximity, respondent has conveyed the message that since Listerine can kill millions of germs, it can cure, prevent and ameliorate colds and sore throats [footnote omitted]. *Warner Lambert*, 86 F.T.C. 1398, 1489-90 (1975), *aff'd*, 562 F.2d 749 (D.C. Cir. 1977), *cert. denied*, 435 U.S. 950 (1978) (emphasis in original).

> On the nature of the claim, *Firestone* is relevant. There the Commission noted that the alleged misrepresentation concerned the safety of respondent's product, "an issue of great significance to consumers. On this issue, the Commission has required scrupulous accuracy in advertising claims, for obvious reasons." 81 F.T.C. 398, 456 (1972), *aff'd*, 481 F.2d 246 (6th Cir.), *cert. denied*, 414 U.S. IU2 (1973).

In each of these cases, other factors, including in some instances surveys, were in evidence on the meaning of the ad.

[8]The evidence can consist of expert opinion, consumer testimony (particularly in cases involving oral representations), copy tests, surveys, or any other reliable evidence of consumer interpretation.

[9]As the Commission noted in the Cigarette rule, "The nature, appearance, or intended use of a product may create the impression on the mind of the consumer . . . and if the impression is false, and if the seller does not take adequate steps to correct it, he is responsible for an unlawful deception." Cigarette Rule Statement of Basis and Purpose, 29 FR 8324, 8352 (July 2, 1964).

[10]*Porter & Dietsch*, 90 F.T.C. 770, 873-74 (1977), *aff'd.* 605 F.2d 294 (7th Cir. 1979), *cert. denied*, 445 U.S. 950 (1980); *Simeon Management Corp.*, 87 F.T.C. 1184, 1230 (1976), *aff'd*, 579 F.2d 1137 (9th Cir. 1978).

[11]*See, e.g., Grolier*, 91 F.T.C. 315,480 (1978), *remanded on other grounds*, 615 F.2d 1215 (9th Cir. 1980), *modified on other grounds*, 98 FM 882 (1981), *reissued*, 99 F.T.C. 379 (1982).

[12]In *Peacock Buick*, 86 F.T.C. 1532 (1975), *aff'd*, 553 F.2d 97 (4th Cir. 1977), the Commission held that absent a clear and early disclosure of the prior use of a late model car, deception can result from the setting in which a sale is made and the expectations of the buyer ... *Id* at 1555.

Even in the absence of affirmative misrepresentations, it is misleading for the seller of late model used cars to fail to reveal the particularized uses to which they have been put... When a later model used car is sold at close to list price ... the assumption likely to be made by some purchasers is that, absent disclosure to the contrary, such car has not previously been used in a way that might substantially impair its value. In such circumstances, failure to disclose a disfavored prior use may tend to mislead. *Id* at 1557-58.

[13]In *Leonard Porter*, the Commission dismissed a complaint alleging that respondents' sale of unmarked products in Alaska led consumers to believe erroneously that they were handmade in Alaska by natives. Complaint counsel had failed to show that consumers of Alaskan craft assumed respondents' products were handmade by Alaskans in Alaska. The Commission was unwilling, absent evidence, to infer from a viewing of the items that the products would tend to mislead consumers.

By requiring such evidence, we do not imply that elaborate proof of consumer beliefs or behavior is necessary, even in a case such as this, to establish the requisite capacity to deceive. However, where visual inspection is inadequate, some extrinsic testimony evidence must be added. 88 F.T.C. 546, 626, n.5 (1976).

[14]*Bait and Switch Policy Protocol*, December 10, 1975; Guides Against Bait Advertising, 16 C.F.R. 238.0 (1967). 32 PR 15,540.

[15]*Encyclopedia Britannica* 87 F.T.C. 421, 497 (1976), *aff'd*, 605 F.2d 964 (7th Cir. 1979), *cert. denied*, 445 U.S. 934 (1980), *modified*, 100 F.T.C. 500 (1982).

[16] See the complaints in *BayleySuit*, C-3117 (consent agreement) (September 30,1983) [102 F.T.C. 1285]; *Figgie International, Inc.*, D. 9166 (May 17, 1983).

[17] The Commission's complaints in *Chrysler Corporation*, 99 F.T.C. 347 (1982), and *Volkswagen of America*, 99 F.T.C. 446 (1982), alleged the failure to disclose accurate use and care instructions for replacing oil filters was deceptive. The complaint in *Ford Motor Co.*, D. 9154, 96 F.T.C. 362 (1980), charged Ford with failing to disclose a "piston scuffing" defect to purchasers and owners which was allegedly widespread and costly to repair. *See also General Motors*, D. 9145 (provisionally accepted consent agreement, April 26, 1983). [102 F.T.C. 1741]

[18] *See Jay Norris Corp.*, 91 F.T.C. 751 (1978), *aff'd with modified language in order*, 598 P.2d 1244 (2d Cir. 1979), *cert. denied*, 444 U.S. 980 (1979) (failure to consistently meet guarantee claims of "immediate and prompt" delivery as well as money back guarantees); *Southern States Distributing Co.*, 83 F.T.C. 1126 (1973) (failure to honor oral and written product maintenance guarantees, as represented); *Skylark Originals, Inc.*, 80 F.T.C. 337 (1972), *aff'd*, 475 F.2d 1396 (3d Cir. 1973) (failure to promptly honor moneyback guarantee as represented in advertisements and catalogs); *Capitol Manufacturing Corp.*, 73 F.T.C. 872 (1968) (failure to fully, satisfactorily and promptly meet all obligations and requirements under terms of service guarantee certificate).

[19] The evidence necessary to determine how reasonable consumers understand a representation is discussed in Section II of this letter.

[20] An interpretation may be reasonable even though it is not shared by a majority of consumers in the relevant class, or by particularly sophisticated consumers. A material practice that misleads a significant minority of reasonable consumers is deceptive. *See Heinz W. Kirchner*, 63 F.T.C. 1282 (1963).

[21] A secondary message understood by reasonable consumers is actionable if deceptive even though the primary message is accurate. *Sears, Roebuck & Co.*, 95 F.T.C. 406, 511 (1980), *aff'd* 676 F.2d 385, (9th Cir. 1982); *Chrysler*, 87 F.T.C. 749 (1976), *aff'd*, 561 F.2d 357 (D.C. Cir.), *reissued* 90 F.T.C. 606 (1977); *Rhodes Pharmacal Co.*, 208 F.2d 382, 387 (7th Cir. 1953), *aff'd*, 348 U.S. 940 (1955).

[22] *National Comm'n on Egg Nutrition*, 88 F.T.C. 89, 185 (1976), *enforced in part*, 570 F.2d 157 (7th Cir. 1977); *Jay Norris Corp.*, 91 F.T.C. 751, 836 (1978), *aff'd*, 598 F.2d 1244 (2d Cir. 1979).

[23] *National Dynamics*, 82 F.T.C. 488, 524, 548 (1973), *aff'd*, 492 P.2d 1333 (2d Cir.), *cert. denied*, 419 U.S. 993 (1974), *reissued* 85 F.T.C. 39-1 (1976).

[24] *Warner-Lambert*, 86 F.T.C. 1398, 1415 n.4 (1975), *aff'd*, 562 F.2d 749 (D.C. Cir. 1977), *cert denied*, 435 U.S. 950 (1978).

[25] *Grolier*, 91 F.T.C. 315, 430 (1978), *remanded on other grounds*, 615 F.2d 1215 (9th Cir. 1980), *modified on other grounds*, 98 F.T.C. 882 (1981), *reissued*, 99 F.T.C. 379 (1982).

[26] *American Home Products*, 98 F.T.C. 136 (1981), *aff'd* 695 F.2d 681 (3d Cir. 1982). consumers may be led to expect, quite reasonably..." (at 386); "... consumers may reasonably believe..." (*Id.* n.52); "... would reasonably have been understood by consumers...." (at 371); "the record shows that consumers could reasonably have understood this language . . ." (at 372). See also, pp. 373, 374, 375. *Bristol-Myers*, D. 8917 (July 5, 1983), appeal docketed, No. 83-4167 (2nd Cir. Sept. 12,1983)...... ads must be judged by the impression they make on reasonable members of the public . . . " (Slip Op. at 4); ". . . consumers could reasonably have understood . . ." (Slip Op. at 7); ". . . consumers could reasonably infer . . ." (Slip Op. at 11) [ 102 F.T.C. 21 (1983)]. *Sterling Drug, Inc.*, D. 8919 (July 5,1983), appeal docketed, No. 83-7700 (9th Cir. Sept. 14,1983)...... consumers could reasonably assume . . ." (Slip Op. at 9); ". . . consumers could reasonably interpret the ads . . ." (Slip Op. at 33). [102 F.T.C. 395 (1983)]

[27] *Horizon Corp.*, 97 F.T.C. 464, 810 n.13 (1981).

[28] *Simeon Management*, 87 F.T.C. 1184, 1230 (1976).

[29] The listed categories are merely examples. Whether children, terminally ill patients, or any other subgroup of the population will be considered a special audience depends on the specific factual context of the claim or the practice.

The Supreme Court has affirmed this approach. "The determination whether an advertisement is misleading requires consideration of the legal sophistication of its audience." *Bates v. Arizona*, 433 U.S. 350, 383 n.37 (1977).

[30] In one case, the Commission's complaint focused on seriously ill persons. The ALJ summarized: According to the complaint, the frustrations and hopes of the seriously ill and their families were exploited, and the representation had the tendency and capacity to induce the seriously ill to forego conventional medical treatment worsening their condition and in some cases hastening death, or to cause them to spend large amounts of money and to undergo the inconvenience of traveling for a non-existent "operation." *Travel King*, 86 F.T.C. 715, 719 (1975).

[31] *FTC v. Sterling Drug*, 317 F.2d 669, 674 (2d Cir. 1963).

[32] Numerous cases exemplify this point. For instance, in *Pfizer*, the Commission ruled that "the net impression of the advertisement, evaluated from the perspective of the audience to whom the advertisement is directed, is controlling." 81 F.T.C. 23, 58 (1972).

[33] In *Litton Industries*, the Commission held that fine print disclosures that the surveys included only "Litton authorized" agencies were inadequate to remedy the deceptive characterization of the survey population in the headline. 97 F.T.C. 1, 71, n.6 (1981), *aff'd as modified*, 676 F.2d 364 (9th Cir. 1982). Compare the Commission's note in the same case that the fine print disclosure "Litton and one other brand" was reasonable to quote the claim that independent service technicians had been surveyed, "[F]ine print was a reasonable medium for disclosing a qualification of only limited relevance." 97 F.T.C. 1, 70, n.5 (1981).

In another case, the Commission held that the body of the ad corrected the possibly misleading headline because in order to enter the contest, the consumer had to read the text, and the text would eliminate any false impression stemming from the headline. *D.L. Blair*, 82 F.T.C. 234, 255,256 (1973).

In one case respondent's expert witness testified that the headline (and accompanying picture) of an ad would be the focal point of the first glance. He also told the administrative law judge that a consumer would spend [t]ypically a few seconds at most" on the ads at issue. *Crown Central*, 84 F.T.C. 1493, 1543 nn. 14-15 (1974),

34In *Giant Food*, the Commission agreed with the examiner that the fine-print disclaimer was inadequate to correct a deceptive impression. The Commission quoted from the examiner's finding that "very few if any of the persons who would read Giant's advertisements would take the trouble to, or did, read the fine print disclaimer." 61 F.T.C. 326, 348 (1962).

*Cf. Beneficial Corp. v. FTC*, 542 P.2d 611, 618 (3d Cir. 1976), where the court reversed the Commission's opinion that no qualifying language could eliminate the deception stemming from use of the slogan "Instant Tax Refund."

35"Respondents argue that the contracts which consumers signed indicated that credit life insurance was not required for financing, and that this disclosure obviated the possibility of deception. We disagree. It Is clear from consumer testimony that oral deception was employed in some instances to cause consumers to ignore the warning in their sales agreement. . ." *Peacock Buick*, 86 F.T.C. 1532, 1558-59 (1974).

36*Exposition Press*, 295 F.2d $69, 873 (2d Cir. 1961); *Gimbel Bros.*, 61 F.T.C. 1051, 1066 (1962); *Carter Products*, 186 F.2d 821, 824 (1951).

By the same token, money-back guarantees do not eliminate deception. In *Sears*, the Commission observed:

> A money-back guarantee is no defense to a charge of deceptive advertising.... A money-back guarantee does not compensate the consumer for the often considerable time and expense incident to returning a major-ticket item and obtaining a replacement.

*Sears, Roebuck and Co.*, 95 F.T.C. 406, 518 (1980), *aff'd*, 676 F.2d 385 (9th Cir. 1982). However, the existence of a guarantee, if honored, has a bearing on whether the Commission should exercise its discretion to prosecute. *See* Deceptive and Unsubstantiated Claims Policy Protocol, 1975.

37*See American Home Products*, 98 F.T.C. 136, 370 (1981), *aff'd*, 695 F.2d 681, 688 (3d Cir. Dec. 3, 1982), Whether a disclosure on the label cures deception in advertising depends on the circumstances:

> ... it is well settled that dishonest advertising is not cured or excused by honest labeling [footnote emitted]. Whether the ill-effects of deceptive nondisclosure can be cured by a disclosure requirement limited to labeling, or whether a further requirement of disclosure in advertising should be imposed, is essentially a question of remedy. As such it is a matter within the sound discretion of the Commission [footnote omitted]. The question of whether in a particular case to require disclosure in advertising cannot be answered by application of any

hard-and-fast principle. The test is simple and pragmatic: Is it likely that, unless such disclosure is made, a substantial body of consumers will be misled to their detriment? *Statement of Basis and Purpose for the Cigarette Advertising and Labeling Trade Regulation Rule*, 1965, pp. 89-90. 29 FR 8325 (1964).

Misleading "door openers" have also been found deceptive (Encyclopedia Britannica, 87 F.T.C. 421 (1976), *aff'd*, 605 P.2d 964 (7th Cir. 1979), *cert. denied*, 445 U.S. 934 (1980), *as modified*, 100 F.T.C. 500 (1982)), as have offers to sell that are not bona fide offers (*Seekonk Freezer Meats, Inc.*, 82 F.T.C. 1025 (1973)). In each of these instances, the truth is made known prior to purchase.

[38] In the Listerine case, the Commission held that pro forma statements of no absolute prevention followed by promises of fewer colds did not cure or correct the false message that Listerine will prevent colds. *Warner Lambert* 86 F.T.C. 1398, 1414 (1975), *aff'd*, 562 F.2d 749 (D.C. Cir. 1977), *cert. denied*, 435 U.S. 950 (1978).

[39] *Chicago Metropolitan Pontiac Dealers' Ass'n*, C. 3110 (June 9,1983). [101 F.T.C. 854 (1983)]

[40] An opinion is a representation that expresses only the behalf of the maker, without certainty, as to the existence of a fact, or his judgement as to quality, value, authenticity, or other matters of judgement. American Law Institute, Restatement on Torts, Second ¶ 538 A.

[41] *Id.* ¶ 539. At common law, a consumer can generally rely on an expert opinion. *Id.*, ¶ 542(a). For this reason, representations of expert opinion will generally be regarded as representations of fact.

[42] "[T]here is a category of advertising themes, in the nature of puffing or other hyperbole, which do not amount to the type of affirmative product claims for which either the Commission or the consumer would expect documentation." *Pfizer, Inc*, 81 F.T.C. 23, 64 (1972).

The term "Puffing" refers generally to an expression of opinion not made as a representation of fact. A seller has some latitude in puffing his goods, but he is not authorized to misrepresent them or to assign to them benefits they do not possess [cite omitted]. Statements made for the purpose of deceiving prospective purchasers cannot properly be characterized as mere puffing. *Wilmington Chemical*, 69 F.T.C. 828, 865 (1966).

[43] In *Avalon Industries*, the ALJ observed that the "'ordinary person with a common degree of familiarity with industrial civilization' would expect a reasonable relationship between the size of package and the size of quantity of the contents. He would have no reason to anticipate slack filling." 83 F.T.C. 1728, 1750 (1974) (I. D.).

[44] "A misleading claim or omission in advertising will violate Section 5 or Section 12, however, only if the omitted information would be a material factor in the consumer's decision to purchase the product." *American Home Products Corp.*, 98 F.T.C. 136,368 (1981), *aff'd*, 695 F.2d 681 (3d Cir. 1982). A claim is material if it is likely to affect consumer behavior. "Is it likely to affect the average consumer in deciding whether to purchase the advertised product-is there a material deception, in other words?" Statement of Basis and Purpose, *Cigarette Advertising and Labeling Rule*, 1965, pp. 86-87. 29 FR 8325 (1964).

[45] Material information may affect conduct other than the decision to purchase a product. The Commission's complaint in *Volkswagen of America*, 99 F.T.C. 446 (1982), for example, was based on provision of inaccurate instructions for oil filter installation. In its *Restatement on Torts, Second*, the American Law Institute defines a material misrepresentation or omission as one which the reasonable person would regard as important in deciding how to act, or one which the maker knows that the recipient, because of his or her own peculiarities, is likely to consider important. Section 538(2). The Restatement explains that a material fact does not necessarily have to affect the finances of a transaction. "There are many more-or-less sentimental considerations that the ordinary man regards as important." Comment on Clause 2(a)(d).

[46] In evaluating materiality, the Commission takes consumer preferences as given. Thus, if consumers prefer one product to another, the Commission need not determine whether that preference is objectively justified. *See Algoma Lumber*, 291 U.S. 54, 78 (1933). Similarly, objective differences among products are not material if the difference is not likely to affect consumer choices.

[47] The Commission will always consider relevant and competent evidence offered to rebut presumptions of materiality.

[48] Because this presumption is absent for some implied claims, the Commission will take special caution to ensure materiality exists in such cases.

[49] *Central Hudson Gas & Electric Co. v. PSC*, 447 U.S. 557, 567 (1980).

[50] *Cf. Restatement on Contracts, Second* ¶ 162(l).

[51] In *American Home Products*, the evidence was that the company intended to differentiate its products from aspirin. The very fact that AHP sought to distinguish its products from aspirin strongly implies that knowledge of the true ingredients of those products would be material to purchasers." *American Home Products*, 98 F.T.C. 136, 368 (1981), *aff'd*, 695 F.2d 681 (3d. Cir. 1982).

[52] In *Fedders*, the ads represented that only Fedders gave the assurance of cooling on extra hot, humid days. "Such a representation is the raison d'etre for an air conditioning unit-it is an extremely material representation." 85 F.T.C. 38, 61 (1975) (I.D.), *petition dismissed*, 529 F.2d 1398 (2d Cir.), *cert. denied*, 429 U.S. 818 (1976).

[53] "We note at the outset that both alleged misrepresentations go to the issue of the safety of respondent's product, an issue of great significance to consumers." *Firestone*, 81 F.T.C. 398, 456 (1972), *aff'd*, 481 P.2d 246 (6th Cir.), *cert. denied*, 414 U.S. 1112 (1973).

[54] The Commission found that information that a product was effective in only the small minority of cases where tiredness symptoms are due to an iron deficiency, and that it was of no benefit in all other cases, was material. *J.B. Williams Co.*, 68 F.T.C. 481, 546 (1965), *aff'd*, 381 F.2d 884 (6th Cir. 1967).

[55] As the Commission noted in *MacMillan, Inc.*:

> In marketing their courses, respondents failed to adequately disclose the number of lesson assignments to be submitted in a course. These were material facts necessary for the student to calculate his tuition obligation, which was based on the number of lesson assignments he submitted for grading. The nondisclosure of these material facts combined with the confusion arising from LaSalle's inconsistent use of terminology had the capacity to mislead students about the nature and extent of their tuition obligation. *MacMillan, Inc.*, 96 F.T.C. 208, 303-304 (1980).

*See also, Peacock Buick*, 86 F.T.C. 1532, 1562 (1975), *aff'd*, 553 F.2d 97 (4th Cir. 1977).

[56] *Simeon Management Corp.*, 87 F.T.C. 1184 (1976), *aff'd*, 579 P.2d 1137, 1168, n.10 (9th Cir. 1978).

[57] In *American Home Products*, the Commission approved the ALJ's finding of materiality from an economic perspective:

> If the record contained evidence of a significant disparity between the prices of Anacin and plain aspirin, it would form a further basis for a finding of materiality. That is, there is a reason to believe consumers are willing to pay a premium for a product believed to contain a special analgesic ingredient but not for a product whose analgesic is ordinary aspirin. *American Home Products*, 98 F.T.C. 136, 369 (1981), *aff'd*, 695 F.2d 681 (3d Cir. 1982).

[58] The prohibitions of Section 5 are intended to prevent injury to competitors as well as to consumers. The Commission regards injury to competitors as identical to injury to consumers. Advertising and legitimate marketing techniques are intended to "lure" competitors by directing business to the advertiser. In fact, vigorous competitive advertising can actually benefit consumers by lowering prices, encouraging product innovation, and increasing the specificity and amount of information available to consumers. Deceptive practices injure both competitors and consumers because consumers who preferred the competitor's product are wrongly diverted.