UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE PROCTER & GAMBLE COMPANY | : | |
| | : | **NO. 07 CIV 8379 (RJS)** |
| Plaintiff, | : | **ECF Case** |
| v. | : | |
| ULTREO, INC. | : | |
| Defendant. | : | |

### DECLARATION OF MOHAN RAO, PH.D.

---

**1.** I, Mohan Rao, Ph.D., declare under penalty of perjury that the foregoing is true and correct.

**2.** I am a Director at LECG and an Adjunct Professor at the McCormick School of Engineering and Applied Science at Northwestern University. I have a Bachelor of Science in Engineering from the University of Michigan, a pre-doctoral fellowship from Harvard University, and a Ph.D. from the University of Colorado. I was a recipient of the Cooley Award from the University of Michigan College of Engineering and the David Cattel Fellowship from UCLA. Prior to joining LECG, I was a Managing Director at InteCap, Inc. and Vice President at Charles River Associates. Prior to that, I was a professor at UCLA and a Teaching Fellow at Harvard University. I am a member of the American Economic Association, the IEEE, and the Intellectual Property Owners Association (Patent Litigation Committee). I also am the Chair of the Valuation and Taxation Committee of the Licensing Executives Society.

**3.** I teach financial economics at Northwestern University. I also teach intermediate and advanced courses on intellectual property valuation at the Licensing Executives Society. I am the co-author of the chapter on econometrics in the *Litigation Services Handbook*, a leading reference for financial experts in litigation matters. I have performed economic and damages analysis as an expert in a wide range of intellectual property matters, including those involving false advertising claims.

**4.** A copy of my curriculum vitae is attached as Tab 1. LECG bills $525 per hour for my work on this matter.

**5.** I have been retained by Winston & Strawn, counsel for Ultreo, Inc. ("Ultreo") to evaluate certain economic and financial issues related to Procter & Gamble Company's ("P&G") claims against Ultreo in this litigation. Specifically, I have been asked to evaluate causation issues and the allegations of injury in the Affidavit of Wayne Randall filed in support of P&G's motion for a preliminary injunction.[1]

**6.** It is my understanding that the allegations in this litigation are that Ultreo is engaging in false and deceptive advertising related to its powered toothbrush. P&G alleges that "Ultreo's advertising campaign for its Ultrasound toothbrush expressly and impliedly conveys false messages to consumers that the ultrasound feature will reduce plaque, that the ultrasound feature will clean teeth, that the ultrasound feature will provide a feeling of clean, that the ultrasound feature is magic, and that the frequency of the ultrasound feature is four million cycles."[2]

**7.** In conducting my analysis, I have reviewed various documents produced in this litigation, including pleadings, affidavits, documents produced by P&G, and other publicly available information. A list of materials which I considered in forming the opinions set forth in this Declaration is attached as Tab 2. It is my understanding that discovery in this matter is on-going. Therefore, I reserve the right to modify or

---

[1] Affidavit of Wayne Randall in Support of Plaintiff's Motion for a Preliminary Injunction, dated October 18, 2007.

[2] Complaint at paragraph 33.

supplement this Declaration as appropriate.

## Background

**8.** P&G, based in Cincinnati, Ohio, is a global branded consumer products company with presence in over 180 countries around the world and with annual sales of more than $76 billion.[3] Its key business units are Beauty and Health, Household Care, and Gillette.[4]

**9.** Ultreo, based in Redmond, Washington, is the maker of the Ultreo powered toothbrush. Ultreo is sold through dental offices, internet retailers such as drugstore.com, amazon.com, and frontgate.com, and specialty retailers such as The Sharper Image.[5] Ultreo is also available through ultreo.com.[6]

**10.** Sales of toothbrushes in the United States were approximately $876 million in 2006. Of these, sales of manual toothbrushes were $522 million, or, approximately, 60 percent of the market. Sales of powered toothbrushes and replacement brush heads accounted for the remaining 40 percent of the market, with approximate sales of $354 million.[7]

**11.** P&G's U.S. sales of powered toothbrushes and replacement brush heads in 2006 were $150 million.[8]

**12.** Other large powered toothbrush competitors include Philips ($90 million

---

[3] "2007 Annual Report," Procter & Gamble Company.

[4] "2007 Annual Report," Procter & Gamble Company.

[5] Ultreo is also sold through Bartell Drugs in the state of Washington.

[6] "Ultreo, Inc. Files Countersuit Against Procter & Gamble," *Business Wire*, October 18, 2007.

[7] "Oral Care – The Market – US – April 2007," Mintel International Group Limited, 2007, Figure 5.

[8] P&G's powered toothbrushes include Braun Oral-B Flexisoft, Oral-B Crossaction Power Max, Braun Oral-B, Oral-B Professional Care, Oral-B Triumph, Oral-B Crossaction, Braun Oral-B Sonic Complete, Oral-B Vitality, Oral-B Stages, and Oral-B Dual Action; see "Oral Care – The Market – US – April 2007," Mintel International Group Limited, 2007, Figure 25.

in 2006 sales), Church & Dwight Co., Inc. ($54 million in 2006 sales) and Colgate-Palmolive Company ($17 million in 2006 sales).[9]

**13.** It is my understanding that Ultreo has sold over 40,000 brushes since its launch in February 2007.

**14.** Toothbrushes are mainly distributed through supermarkets, drug stores, and mass merchandisers.[10]

**15.** Mr. Randall, Vice President and Brand Franchise Leader for the P&G Global Oral Care business testified that the market for power toothbrushes priced above $60 per unit accounted for $79.8 million in sales in the United States for the year ending August 2007.[11] According to Mr. Randall, P&G's Oral-B accounts for 38.2 percent of the dollar sales of these toothbrushes priced over $60.[12] Mr. Randall asserts that a new product advertised with dramatic performance claims can quickly capture a large market share.[13] Based on an analysis by Coulter-Renken, Mr. Randall alleges that Ultreo will sell 66,000 toothbrushes in the first year after launch, and over 50 percent of these purchases will come from customers who otherwise would have purchased an Oral-B high-end toothbrush.[14] Therefore, P&G concludes that it will be irreparably harmed by Ultreo's presence in the marketplace.[15] As I discuss below,

---

[9] "Oral Care – The Market – US – April 2007," Mintel International Group Limited, 2007, Figure 25.

[10] "Oral Care – The Market – US – April 2007," Mintel International Group Limited, 2007, Figure 51.

[11] Affidavit of Wayne Randall in Support of Plaintiff's Motion for a Preliminary Injunction, paragraph 6.

[12] Affidavit of Wayne Randall in Support of Plantiff's Motion for a Preliminary Injunction, paragraph 6.

[13] Affidavit of Wayne Randall in Support of Plantiff's Motion for a Preliminary Injunction, paragraph 10.

[14] Affidavit of Wayne Randall in Support of Plantiff's Motion for a Preliminary Injunction, paragraph 23; "Oral Care Toothbrush Study: Introduction of Ultreo 2007," Coulter-Renken at page 18, PG000159.

[15] Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction, October 26,

there are a number of significant flaws in P&G's economic analysis related to both causation and injury. These include:

- The Coulter-Renken study on which Mr. Randall and P&G rely for their conclusions is fundamentally flawed and overstates any potential harm to P&G from Ultreo.

- All of the injury referred to in Mr. Randall's Affidavit is quantifiable.

- Neither the Coulter-Renken study nor Mr. Randall establish a causal link between Ultreo's alleged false advertising and P&G's lost sales.

- Even if we assume that the Coulter-Renken study and Mr. Randall's analyses are accurate, any potential harm to P&G would be inconsequential.

### P&G overstates any potential harm from Ultreo

16.

Contains Information Designated As
"Confidential" Pursuant To November 9,
2007 Stipulated Confidentiality Order In
This Action

17.

# REDACTED

Confidential                                                                                          6

18.


19.


Contains Information Designated As
"Confidential" Pursuant To November 9,
2007 Stipulated Confidentiality Order In
This Action


**REDACTED**.


20.

Confidential                                                                    7

21.

Contains Information Designated As
"Confidential" Pursuant To November 9,
2007 Stipulated Confidentiality Order In
This Action

**REDACTED**

22.

Confidential                                                                 8

23.          Contains Information Designated As
             "Confidential" Pursuant To November 9,
             2007 Stipulated Confidentiality Order In
             This Action

# REDACTED

24.

All of the injury referred to in Mr. Randall's Affidavit is quantifiable

25.

.

Confidential                                                                                        9

26.

Contains Information Designated As
"Confidential" Pursuant To November 9,
2007 Stipulated Confidentiality Order In
This Action


# REDACTED


P&G does not establish a causal link between false advertising and lost sales

27.

Confidential                                                                10

28.

Contains Information Designated As
"Confidential" Pursuant To November 9,
2007 Stipulated Confidentiality Order In
This Action

# REDACTED

29.

30.

Confidential                                                                        11

P&G's potential harm is inconsequential

31.

Contains Information Designated As
"Confidential" Pursuant To November 9,
2007 Stipulated Confidentiality Order In
This Action

# REDACTED

Confidential                                                                12

**32.**  The bottom line is that, even if we assume the estimates on P&G's lost sales provided by the deeply flawed Coulter-Renken study are correct, the likely potential harm to P&G is both quantifiable and small.

Mohan Rao, Ph.D.

27 November 2007

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on November 30, 2007, I caused a copy of the foregoing **REDACTED DECLARATION OF MOHAN RAO PH.D.** to be served upon counsel for The Procter & Gamble Company by the Court's ECF Filing System and by hand delivery to the following individual:

Laura W. Sawyer
**JONES DAY**
222 East 41st Street
New York, New York 10017

**Attorneys for The Proctor & Gamble Company**

Dated: New York, New York
      November 30, 2007

_____
      Lina M. Viviano