UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------x
:
THE PROCTER & GAMBLE COMPANY,    :
:
        Plaintiff,    :   No. 07 Civ. 8379 (RJS)
:
   vs.    :   ECF Case
:
ULTREO, INC.,    :
:
        Defendant.    :
:
---------------------------------x

## SUPPLEMENTAL DECLARATION OF WAYNE D. RANDALL IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Wayne D. Randall, hereby says as follows:

1. I submit this supplemental affidavit in support of the Procter & Gamble Company's (P&G's) Motion for Preliminary Injunction, and in particular to discuss how and why P&G will be harmed as a result of the false claims of Ultreo regarding its Ultrasound toothbrush. In so doing, I will address the criticisms of Ultreo's expert, Mohan Rao, regarding the Coulter-Renken analysis that I discussed in my initial affidavit. I also submit this supplemental affidavit to address Ultreo's allegation that Philips Oral Healthcare ("Philips") makes "beyond the bristles" claims substantiated only by laboratory studies.

2. Coulter-Renken is an independent market research company that performs market research for P&G, and other companies. The Coulter-Renken analysis submitted with my initial affidavit is a "paired choice model." Paired choice models are routinely used by P&G and other consumer marketing companies to investigate the impact of a new product entry upon existing

competition. Consumers are shown a wide variety of different products, presented in pairs, with price point and basic attributes, and are asked to make a purchase decision based upon this information. The Coulter-Renken analysis regarding the effect of the Ultreo product entry estimated that Ultreo would sell 66,000 power toothbrushes in its first year of commercialization, and that 50.8 percent of those sales (approximately 34,000 brushes) would have displaced sales that otherwise would have been made by P&G.

3. Dr. Mohan Rao, Ultreo economic expert, has submitted a declaration in this case that criticizes the Coulter-Renken analysis. He asserts that the analysis is flawed, and overstates any potential harm to P&G. He also says that this analysis does not establish a causal link between Ultreo's false advertising and P&G's lost sales.

4. With respect to Dr. Rao's assertion that the analysis does not accurately forecast the effect of Ultreo's market entry, he offers no empirical data to support this opinion. Dr. Rao merely assumes that there must be some forecasting error in the model. However, while no consumer forecast can be perfect, models of this type are used routinely to make decisions by P&G and other marketing companies. These models have been repeatedly validated as accurate predictors of actual market conditions, and Dr. Rao does not contend otherwise.

5. Dr. Rao's other criticism of the Coulter-Renken analysis is that it does not establish a "causal link" between Ultreo's false advertising and P&G sales. But Dr. Rao appears to have misunderstood the purpose of the analysis. The study was not intended to analyze the effect of false advertising on P&G sales, and was not prepared for the purpose of litigation. Rather, the analysis was commissioned to determine the effect of Ultreo's market entry. The purpose was to estimate the extent of Ultreo's first year sales, as well as the effect of the market entry on P&G sales--without regard to any allegations of false or misleading advertising. Indeed,

in the "product pairs attributes," the respondents were not shown any advertising that is alleged to be false in this case. Accordingly, as Dr. Rao has now acknowledged in his deposition, the Coulter-Renken analysis was only intended to establish the effect of Ultreo's "normal competition,"--*i.e.*, the effect of Ultreo's entry into the market.

6.  While the Coulter-Renken analysis, in and of itself, was not intended to forecast the effect of Ultreo's false and misleading advertising, it serves as a useful tool in estimating the baseline effect of Ultreo's market entry and the effect of normal competition. In this regard, its forecast of sales of 66,000 units provides an estimate of the amount of Ultreo's sales which would be expected to result from normal competition; *i.e.*, market entry with no false or misleading advertising. To the extent that Ultreo's actual first year sales are above this figure, it is reasonable to assume that Ultreo's aggressive advertising campaign was, and remains, a significant factor in achieving these additional sales.

7.  Ultreo's sales, which began in March, 2007, have already exceeded the 66,000 full year estimate, and Ultreo predicts they will reach 100,000 for the first full year of commercialization. It is reasonable to conclude that Ultreo's false and misleading advertising has contributed significantly to its actual sales volume. Discovery in the case has revealed that Ultreo's advertising claims are very important to its commercial success. Mr. Gallagher testified that if Ultreo were not permitted to engage in its "core advertising," its sales would diminish significantly. Mr. Gallagher also testified that if dentists were to be informed that the ultrasound bubbles had not been demonstrated to be clinically effective in the mouth they would question the efficacy of the product. I agree with Mr. Gallagher in this regard. In marketing these products, Ultreo's core advertising, and the opinions of dentists and dental hygienists, are very important to its commercial success. If consumers and dental professionals understood that the

ultrasound component does not provide a plaque removal benefit, or that the "bubbles" did not remove plaque, Ultreo's sales would decline.

8. Accordingly, it is reasonable to conclude that Ultreo's false and misleading advertising is contributing to the 100,000 units that it will sell in its first year, and that Ultreo's actual sales are significantly increased as a result of its false and misleading advertising campaign. I also note that some of Dr. Rao's criticisms of the Coulter-Renken analysis would actually serve to lower the forecasts of sales resulting from normal competition (although Dr. Rao does not quantify these effects.) Should that be the case, then lost sales due to Ultreo's false advertising would be even greater than that predicted by the comparison of the Coulter-Renken analysis to Ultreo's actual sales.

9. Of the additional sales that Ultreo will achieve by virtue of its false and deceptive advertising campaign, the Coulter-Renken analysis demonstrates that P&G will lose approximately one half (50.8%) of these sales. While this estimate is above Oral-B's actual market share, we expect that the effect of the Ultreo launch, and the effect of the Ultreo false and misleading advertising campaign, will have a disproportionate effect on sales of P&G's Oral-B power toothbrushes, as opposed to sales of the competing Sonicare power toothbrushes.

10. From other consumer work, we know that Oral-B power toothbrush users are more willing to switch to new brands than Sonicare users. We also know that Oral-B power toothbrush users are more likely to purchase new product innovations than Sonicare users. Those findings are confirmed by the Coulter-Renken prediction that 50.8% of market share loss will be attributable to Oral-B products.

4

11. Based upon the evidence submitted in connection with the case, and in particular, the discovery provided by Ultreo, it is clear that Ultreo's false and misleading claims are having the direct effect of increasing Ultreo's sales, and decreasing P&G's sales.

12. With respect to Ultreo's allegation that Philips makes "beyond the bristles" claims substantiated only by laboratory studies, P&G has challenged such claims when such claims came to our attention. In February 1999, The Gillette Company ("Gillette") commenced an action against the Optiva Corporation alleging, among other things, that Optiva made false advertising claims related to its power toothbrushes. Gillette sued Optiva for its claims that its Sonicare toothbrush cleaned teeth not only by bristle contact on teeth, but by producing sonic waves that operate "beyond the reach of the bristles." At the time, it is my understanding that Jack Gallagher, Ultreo's current President and Chief Executive Officer, was Optiva's President. In 2000, Optiva was acquired by Philips Electronics.

13. In 2001, the above action settled pursuant to a confidential settlement agreement. Since the resolution of that dispute, to my knowledge, Philips has not made sonic cleaning claims or "beyond the bristles" claims to consumers. One time when, in the recent brochure for Sonicare's new "FlexCare" toothbrush, Philips attempted to make a "beyond the bristles" cleaning claim to professionals with a reference to a laboratory study and without *in vivo* support, P&G objected. Philips confirmed that the brochure is no longer being distributed.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this /2- day of December, 2007.

*Wayne D. Randall* (signature)
Wayne D. Randall

## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system pursuant to the rules of this court.

Dated December 12, 2007                         s/ Laura W. Sawyer
                                                                                                 Laura W. Sawyer