UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------- x
:
THE PROCTER & GAMBLE COMPANY,   :
:
                Plaintiff,   :  No. 07 Civ. 8379 (HB)
:
       vs.   :  ECF Case
:
ULTREO, INC.,   :
:
                Defendant.   :
:
---------------------------------- :
x

**REBUTTAL DECLARATION OF THOMAS D. DUPONT, PH. D. IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

      1.      I make this declaration in accordance with 28 U.S.C. § 1746 and in support of Plaintiff's Motion for a Preliminary Injunction.

      2.      I am expert in the field of survey research and consumer behavior and have previously submitted a declaration with appended expert report in this matter. My expert report summarized a consumer survey I conducted measuring consumer perceptions of Ultreo's advertising claims.

      3.      This declaration responds to certain criticisms of my survey by Ultreo's expert, Professor Yoram Wind (Wind Declaration, 11/30/07). In my professional opinion, Professor Wind's criticisms are without merit. I will address Prof. Wind's comments paragraph by paragraph.

¶6:  No Control Group

        4.     In certain types of consumer surveys, it may be important to include a control stimulus.  The purpose of using a control stimulus seen by a control group is to attempt to account for any pre-existing beliefs about a product that would affect the responses given by the respondents in the subject study regarding the advertising of the particular product.  The paradigm example of this concept is set forth in the *Reference Guide On Survey Research*,[1] published by the Federal Judicial Center, intended to serve judges in assessing scientific and survey evidence.  As the *Reference Guide* indicates, a control stimulus would be necessary to determine if consumers were misled about a new advertisement of a product, as opposed to their previous conceptions about that product.

> "Thus, the question is whether the commercial misleads consumers into thinking that Product A is a superior pain reliever, not whether consumers hold inaccurate beliefs about the product.  Yet, if consumers already believe, before viewing the commercial, that Product A is a superior pain reliever, a survey that records consumers' impressions after they view the commercial may reflect those preexisting beliefs rather than impressions produced by the commercial."

As the *Reference Guide* suggests, the preferred approach in cases of this nature would be to include a control stimulus that would attempt to control for any preexisting beliefs.

        5.     In this survey of the Ultreo toothbrush, a control stimulus would not have been appropriate.  The Ultreo toothbrush is a new product, and to my knowledge the ultrasound component that is advertised has not been advertised to consumers as an oral hygiene device.  Under these circumstances, there would not be any pre-existing beliefs about the Ultreo product.

---

[1] S. Diamond, "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, 270 (2d ed. 2000), at 256.

2

6. While Prof. Wind criticizes my survey because it does not include a control stimulus to account for any "pre-existing beliefs," he fails to tell this court what these pre-existing beliefs might be. Again, a control stimulus is only necessary to control for pre-existing beliefs about a product. If there are no pre-existing beliefs, as Prof. Wind appears to acknowledge, a control stimulus would be unnecessary. Prof. Wind offers no suggestion as to what preexisting beliefs exist or how they came to be. He merely presupposes that consumers have preexisting beliefs about power toothbrushes that use ultrasound. He does not address the issue (indeed, he cannot) of how he knows these beliefs exist or <u>where</u> they came from, because there is no basis for hypothesizing that such beliefs exist.

7. In any event, to test Prof. Wind's assumption that there were pre-existing beliefs about the Ultreo product, I analyzed the actual verbatim responses that were provided by the survey respondents. I focused on the issue of "bubbles" cleaning the mouth. Whatever slight conception consumers may or may not have had about the effect of ultrasound in oral hygiene, they would have had no conception about the effect of "bubbles" in the oral cavity. Any consumer perception that speaks to the issue of bubbles, and the efficacy of bubbles cleaning in the mouth, could have come only from the Ultreo advertising, and not from any pre-existing beliefs.

8. However, as shown in Exhibit A to this Supplemental Declaration, a significant number of consumers who looked at this advertising believed that the bubbles were an effective cleaning agent. In fact, 42% of the survey respondents used the words "bubbles" or "microbubbles" in describing what the Ultreo toothbrush or the ultrasound does. It is clear that the respondents were clearly affected by the ultrasound claims, and that these claims were not affected by any pre-existing beliefs.

3

¶7: <u>Inappropriate Control Question</u>

9. Irrespective of whether a survey includes a control group exposed to a control stimulus, a survey in a false advertising case may include one or more control questions to measure the degree to which consumers would respond that a particular message was communicated by the advertising, even though no such message was in the advertising. This is often referred to as "yea-saying" bias. My survey included a control question for that purpose, which asked whether or not there was a message about how much Ultreo costs, and if so, how much. There was, if fact, no mention of cost in the advertising. Prof. Wind complains that the question is "inappropriate since it is quite obvious even from a cursory review that cost, which is typically represented by some numerical value and a $ sign, was not mentioned." The fact that the advertising did not mention cost is precisely what makes the cost question a good control question -- it is something that might plausibly be in the advertising, but is not. If someone says that the advertising did talk about cost, then they must be "yea-saying." This was an appropriate control.

¶8: <u>The Test Stimulus Was Not The Actual Ad/Website</u>

10. Prof. Wind criticizes my survey because I selected only certain pages from the Ultreo website. But the purpose of my survey was to determine the effect of Ultreo's advertising claims, and so I presented the Ultreo advertising claims to the respondents. The purpose was not to determine the effect of Ultreo's entire website on respondents, but to determine the effect of its advertising statements, whether made on the Internet, or in publications, or on its packaging, or made orally. My survey chose to use the website as the source of the advertising claims because, at the time, that was the primary medium through

which consumers would be acquainted with Ultreo. The conclusions of this research, however, would be equally applicable to any other advertising medium.

11. With respect to Prof. Wind's specific complaints about my use of the website, he states that respondents did not see the entire website, that one of the statements appeared in a different type face, and that an "old" version of the website was used. On the issue of the entire website, the Ultreo website is complex, with several pages of advertising claims and descriptions of the product, multiple pages of consumer testimonials, a section for dental professionals and information about the company itself. The principal advertising claims of what Ultreo is and what it does are contained on the home page and on the page that is accessed by clicking "learn more" on the home page. Those are the pages I chose to use in my survey, because those are the pages that contain virtually all of the advertising claims and those are the pages that, in my opinion, a consumer potentially interested in the Ultreo toothbrush would be most likely to read. Moreover, it was unreasonable to expect consumers to read every single page of the Ultreo website, a task which could be expected to take 30-60 minutes.

12. Prof. Wind correctly states that one of the statements in my stimulus, "The result is an incredibly long lasting feeling of clean" was presented in a different type face. While it is true that the aforementioned statement was shown in a smaller font size than the paragraph that preceded it, that is exactly the way it appeared on the Ultreo website, and the way it still appears to this day.

13. Prof. Wind also points out several ways in which what I showed respondents differs from what appears on the Ultreo website today. The Ultreo web pages that were shown respondents were those in existence on approximately September 18, 2007, about 10 days before survey interviewing began. Apparently Ultreo has made minor changes to some of

the statements on the website.  In my opinion those changes are inconsequential and would not alter consumer perceptions of what Ultreo was communicating.

¶9: Leading And Biased Questions

14. The *Reference Guide On Survey Research* stresses the importance of avoiding bias by making sure respondents have an opinion on the issue before asking what that opinion is.. As stated in the guide, [2]

> "Some survey respondents may have no opinion on an issue under investigation, either because they have never thought about it before or because the question mistakenly assumes a familiarity with the issue.  For example, survey respondents may not have noticed that the commercial they are being questioned about guaranteed the quality of the product being advertised and thus they may have no opinion on the kind of guarantee it indicated."

15. The *Reference Guide* then goes on to discuss several ways that questions can be constructed to avoid respondent guessing and therefore be non-leading and unbiased. One of those ways is the use of "full filter questions."  As stated in the *Reference Guide*,

> "Finally, the survey can include full filter questions, that is, questions that lay the groundwork for the substantive question by first asking the respondent if he or she has an opinion about the issue or happened to notice the feature that the interviewer is prepared to ask about (e.g., 'Based on the commercial you just saw, do you have an opinion about how long Clover stated or implied that its guarantee lasts?')."

16. My questionnaire was constructed using full filter questions that were very similar to the filter question discussed above in the *Reference Guide*.  Before asking a respondent about something that was mentioned on Ultreo's website, the respondent was asked whether he saw that on the website (e.g., "In what you read, do you recall them mentioning that Ultreo uses

---

[2] Id at 249

6

ultrasound technology?"). Only if the respondent answered in the affirmative was he or she asked the substantive follow-up question, "What does the ultrasound do?"

17. Prof. Wind has characterized the entire questionnaire as leading and biased. He has not, however, stated what he thinks makes the survey questions leading. Since the survey used filter questions, I can only assume that he considers the filter questions themselves to be leading. The filter questions I used are clearly appropriate, and in fact <u>prevent</u> the follow-up questions from being leading by first establishing that the respondent got some message about the subject at issue.

18. Prof. Wind complains that the question, "Please describe how the Ultreo toothbrush works?" is leading. To the contrary, that question is completely open-ended and does not suggest anything about what the answer might be. The only conceivable way that question is leading is that it suggests that the Ultreo toothbrush actually does something – a not unreasonable proposition for a toothbrush, or any other product, for that matter.

19. Prof. Wind takes issue with the question, "Based on what you just saw, do you think the Ultreo toothbrush is different from other power toothbrushes, or not?" He asserts that the "correct way" to ask that question is as a multiple choice question. I disagree; both are equally acceptable, and neither is leading or biased. The key point, to which he does not take issue, is that the question does not suggest how Ultreo might be different from other power toothbrushes.

20. Prof. Wind then finds fault with the question, "In what you read, do you recall them mentioning that Ultreo uses ultrasound technology?" This was followed-up with, "What does the ultrasound do?" Prof. Wind says that this "leads respondents to focus on ultrasound even if they do not recall at all such a message." This makes no sense. The filter

7

question eliminated anyone who got no message about ultrasound. The "do you recall them mentioning that Ultreo uses ultrasound" question is a classic filter question, as described by Diamond.

21.  Prof. Wind goes on to assert that the follow-up question, "What does the ultrasound do?" can be interpreted as a general question about ultrasound, rather than a question about what Ultreo's ultrasound does. That seems far-fetched. The respondents have seen a website that trumpets Ultreo's use of ultrasound technology and describes how the ultrasound works, and answered that yes, they recall the website mentioning that Ultreo uses ultrasound. The context, clearly, is Ultreo's use of ultrasound. It does not seem plausible that consumers would ignore the context and revert to thoughts about what ultrasound does in the abstract. Besides, the answers to the question clearly show that consumers were responding with what the ultrasound does vis a vis cleaning the teeth.

¶11: Inappropriate Universe

22.  The survey universe was comprised of persons who either own a power toothbrush or are likely to consider buying one in the next year or so. Prof. Wind complains that the questions did not ask if the respondent was the one making the buying decision, but this seems a minor point, since if one says he is going to consider buying a power toothbrush, then by definition he must be involved in the purchase decision. Prof. Wind also faults the use of "considering buying" a power toothbrush, and the time frame of "the next year or so". Presumably (he does not say) he would have preferred "plan to buy" or something of that sort and a time frame of a few months. In my opinion, "considering buying in the next year or so" makes sense for a power toothbrush. It is not a necessity, and it is not a product that is bought frequently. The goal of the survey was to include people who were open to the idea of a power

toothbrush – the kind of people who might be moved to buy one if presented with a persuasive advertisement – and to exclude people who under no circumstances would consider buying one.

¶12: Biased and Inappropriate Data Analysis

23. Prof. Wind points out that in the coding of the open-ended responses I did not distinguish between mentions of "ultrasound," "bubbles," and "sonic vibrations." I did not distinguish them because it was my opinion that consumers were using the terms interchangeably to refer to the same thing. Prof. Wind thinks I should have separated "sonic vibration" statements from the "ultrasound" statements, and that had I done so, the results would have been very different.

24. To test his hypothesis I re-coded the data from all four open-ended questions, removing any mentions of "sonic vibrations" or "sonic bristles" unless they were accompanied by a mention of ultrasound itself. The results are appended as Exhibit B, which compares the data as reported in Table 9 of my expert report with the re-tabulated data. The results show a difference of one percentage point between the data as reported and the data tabulated as Prof. Wind would prefer. Instead of 83% saying that Ultreo's ultrasound cleans the teeth or cleans them better, the re-tabulation shows that 82% said that.

¶13: Inappropriate Verification

25. Prof. Wind complains that the method of verification used in my survey was inappropriate and that "To assure that respondents completed the study themselves, it is required, even when using Internet panels, to conduct a follow-up verification." He does not provide a source for this "requirement" policy, but in truth it is a relic from the types of surveys

9

in which one had to be very concerned indeed about the validity of the survey data. As discussed by Thornburg,[3]

> "However, it is important to note that the requirement of verification came about primarily due to traditional surveys hiring college-aged temporary staff to conduct the surveys, which led to inaccurate information and often forgery. As these risks are not inherent with online surveys, this factor may be reduced or even eliminated from consideration by the courts in dealing with the admissibility of Internet surveys."

¶14: <u>The Conclusions Of The Study Cannot Be Relied On</u>

26.  This paragraph in Prof. Wind's declaration is essentially a recap of his previous comments, directed at three of my conclusions. He states that I cannot conclude that the ultrasound itself, or the bubbles created by the ultrasound are themselves alone able to clean the teeth, because, as discussed in his paragraph 12 the data coding did not allow for separating the effect of the ultrasound itself. However, as shown in my paragraph 24 and in Exhibit B, re-coding the data to separate the effects of the ultrasound itself shows clearly that the ultrasound alone is perceived to clean the teeth.

27.  Prof. Wind further asserts that the conclusion that "a deep feeling of clean" is associated with therapeutic benefits "is purely a function of the leading question and the placement of the question in the questionnaire." But Prof. Wind provides no support for his opinion that the question about "a deep feeling of clean" is leading.

28.  The questions about "a deep feeling of clean" were entirely appropriate, and cannot be faulted as "leading." The questions are as follows:

---

[3] Robert H. Thornburg, *Trademark Surveys: Development of Computer Based Survey Methods*, 4 J. Marshall Rev. Intell. Prop. L 91 (2005) at 123

*In what you read, do you recall them saying that Ultreo provides a deep feeling of clean?*
  *Yes*
  *No*
  *Don't know*

*(IF YES) Based on what you read, is there any benefit to the user of having a deep feeling of clean?"*
  *Yes*
  *No*
  *Don't know*

*(IF YES) What is the benefit? Please be as specific as you can and include details.*

29. That is an unbiased and properly filtered series of questions. The only people asked what the benefit was of "a deep feeling of clean" were those who recalled the statement in the advertising, and said there was a benefit associated with it.

30. In his paragraph 13, Prof. Wind also re-states his opinion that the result showing that 86% of respondents said the advertising made them interested in buying an Ultreo toothbrush was due to the placement of the question at the end of a series of leading questions. As pointed out above, the assertion that the questions were leading is baseless, and the questions were quite obviously non-leading. Accordingly, his conclusion that the consumer interest in buying an Ultreo toothbrush cannot be attributed to the website is without foundation.

31. Prof. Wind also states that respondent comments about removal of plaque cannot be relied upon. No basis is given for this assertion, other than his baseless criticisms of the questions as leading. I also wish to call attention to a very misleading statement about plaque removal that appears in Ultreo's *Memorandum Of Law In Opposition To Procter & Gamble's Motion For Preliminary Injunction*. On page 27 of that document Ultreo states, "Indeed, if one considers the consumer responses to Dr. Dupont's first leading question, only 6% of respondents

considered the web pages to be communicating the ability of ultrasound to remove plaque bacteria." That is an extremely misleading statement. Aside from the fact that the question was in fact not leading, the question was not one that would likely elicit a response as to what kinds of things Ultreo's ultrasound might remove. The question asked, "Please describe how the Ultreo toothbrush works." The results were shown in Table 1 of my report, and as one might expect from what the question asked, many respondents (36%) simply said that Ultreo uses ultrasound, or that the ultrasound forms bubbles. Others (18%) just said that the ultrasound cleans the teeth. Very few respondents specified in response to that question exactly what Ultreo cleans off the teeth.

      32. Other, subsequent questions, are more appropriate to measure what Ultreo or the ultrasound cleaned off the teeth, notably the question that asked those who noticed the mention of ultrasound, "What does the ultrasound do," and the one that asked those who thought there was a benefit associated with the ultrasound, "What is the benefit of the ultrasound?" Altogether, as shown in Table 9 of my report (and in Exhibit B to this declaration), 42% of respondents thought the ultrasound cleaned plaque, stains, tartar, food particles or other debris from the teeth, and 40% said it did those things better.

Summary

      33. In summary, Prof. Wind's criticisms of the survey are utterly lacking in foundation. The survey used properly filtered and unbiased questions, and was analyzed properly. My conclusions from the survey are wholly justified, that is:

      a) The vast majority of consumers understand that Ultreo uses ultrasound technology and believe that the ultrasound itself, or the bubbles formed by the ultrasound, alone are able to clean one's teeth.

12

b) Many consumers understand "a deep feeling of clean" to refer to the therapeutic benefit of one's teeth being clean or having good or better oral health.

c) After seeing the advertising, that vast majority of consumers were interested in buying an Ultreo toothbrush.

34.  In my professional opinion, claims similar to those on the Ultreo website, used in other media such as print, TV or packaging, would communicate the same messages to consumers.

35.  I declare under penalty of perjury that the foregoing is true and correct.

_____
Thomas D. Dupont, Ph.D.

Executed on December 11, 2007

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that the foregoing was served electronically by the Court's ECF system pursuant to the rules of this court.

| | |
|---|---|
| Dated December 12, 2007 | s/ Laura W. Sawyer |
| | Laura W. Sawyer |