Slip Copy                                                                                                   Page 5

Slip Copy, 2007 WL 911773 (D.Nev.), 2007-1 Trade Cases P 75,687
**(Cite as: Slip Copy)**

payout selected by the secondary unit. The 783 Application disclosed only one version for a rotating wheel-an electro-mechanical control unit. Bally alleges that during a 1995 Las Vegas tradeshow, Anchor Gaming ("Anchor"), a company that IGT has since acquired, displayed a nonfunctioning version of the purported invention in the 783 Application. Anchor allegedly contacted John Acres, Chairman of Acres Games ("Acres") to develop a working prototype. Bally presents evidence that Mr. Acres and others then developed a working "Wheel of Gold" prototype, which implemented several changes not included in the 783 Application. The Wheel of Gold was built atop a Bally manufactured slot machine. According to Bally, Anchor (now IGT) had no input into the conception and reduction to practice of Acres's concepts. Bally alleges that Acres thereafter improved upon the Wheel of Gold game, and Anchor purchased additional units from Bally.

Because the Wheel of Gold game became so popular, Anchor (IGT) filed another application for a U.S. Patent (the " 764 Application") to patent the new ideas embodied in the Wheel of Gold game. However, Anchor named William R. Adams as the sole inventor. The PTO eventually issued a patent for the 764 Application-the 932 patent. Bally contends that Anchor never disclosed to Bally or Acres that it intended to file a patent on Mr. Acres's and Bally's concepts. Bally further alleges that Anchor failed to name the prior inventors when filing the 764 Application. Bally argues that Anchor acted in the same manner with regards to the 646 patent. Anchor assigned both these patents to IGT, and IGT subsequently purchased Anchor.

Although patents are presumed valid, when a party presents evidence that the patent in question had already been reduced to practice, the Court may entertain a bad faith case based on such allegations. *Handgards II,* 743 F.2d at 1291. Accordingly, Bally has presented sufficient evidence to survive summary judgment on the prior reduction to practice issue.

*b. Misrepresentations about Prior Art*

*6 Intentional withholding of prior art from the PTO may support an antitrust claim based on a bad faith infringement action. *See, e.g., Netflix, Inc. v. Blockbuster, Inc.,* No. C 06-02361 WHA, 2006 U.S. Dist. LEXIS 63154, at *20-21 (N.D.Cal. Aug. 22, 2006); *see also C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1367-68 (Fed .Cir.1998). During the 932 patent prosecution process, the Examiner identified a British Patent Application, GB 2, 201, 21A ("821"), titled "Coin-operated gaming machine." Hans J. Pickardt and Jurgen Schattauer are the named inventors for this patent. The Examiner originally rejected the 646 patent because it was anticipated by Pickardt's invention (the prior art). In describing Pickardt in connection with the claim rejections, the Examiner stated that he understood Pickardt as a random game, not a game of skill. Because the 646 patent was also a random game, the Examiner initially issued a rejection. Several years earlier, IGT had described Pickardt as a random game. However, after the Examiner rejected the 646 patent, IGT filed an amendment to the application and described Pickardt as a game of skill, not a random game. Bally argues that IGT failed to disclose several material references in the Pickardt patent that referred to that game as a random based game. According to Bally, the Examiner then issued the 646 patent because Pickardt did not "teach the claimed slot machine having a 'random number generator for randomly selecting one of said payout amounts, based on an action performed by said random generator, after a payout amount has been selected, said control unit then causing said moveable payout indicator to stop at a stop position based on said selected payout amount.' " (# 25 at 21.) However, Bally has presented evidence that Pickardt did teach a random based game, and that IGT knew that fact but failed to disclose such to the Examiner. Bally claims that the Examiner would not have issued the 646 patent if IGT had made the proper disclosures concerning Pickardt's invention as a random based game. Based on the Examiner's statements above, Bally has presented sufficient evidence to create a material issue of fact.

Bally also argues that IGT failed to disclose other prior-art references despite having knowledge of their existence. Bally supplied IGT with a list of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 6
Slip Copy, 2007 WL 911773 (D.Nev.), 2007-1 Trade Cases P 75,687
**(Cite as: Slip Copy)**

nine prior patents that it contends invalidate IGT's claims in the 646 and 932 patents. IGT failed to disclose these patents to the PTO Examiners. IGT has not opposed these arguments. Bally has presented sufficient evidence to survive summary judgment that IGT initiated its patent infringement claim in bad faith, at least as to the 646 and 932 patents.

### 2. *Specific Intent to Control Prices or Destroy Competition*

IGT has not offered sufficient evidence to overcome Bally's claims that IGT acted with intent to control prices or destroy competition. An antitrust plaintiff can establish specific intent "not only by direct evidence of unlawful design, but by circumstantial evidence of illegal conduct."*Handgards II,* 743 F.2d at 1293. In addition, the "requisite intent to monopolize ... could be inferred from a finding of bad faith."*Id.* (quoting *Handgards I,* 601 F.2d at 993 n. 13). Bally has presented evidence that IGT knew that at least two of the patents subject in this suit are invalid. In addition, as discussed below, IGT has previously threatened to sue other companies for infringing these allegedly invalid patents unless those entities signed agreements wherein they promised to cease using the technology or claims at issue in the patents. IGT issued press releases implying it would sue anyone who infringed those patents. This evidence, along with the evidence supporting bad faith, provides a sufficient basis that a genuine issue of material fact exists as to IGT's specific intent to monopolize. *Id.* Accordingly, Bally has presented enough evidence regarding this element to survive summary judgment.

### 3. *Predatory Conduct and a Dangerous Probability of Success Within the Relevant Market*

\*7 IGT contends that Bally cannot demonstrate dangerous probability of success because it cannot prove any actual exclusion from the wheel game market. However, even if they could not prove actual exclusion, the Ninth Circuit has "never established an actual exclusion requirement."*Id.* at 1294."A jury may infer a dangerous probability of success 'either (1) from direct evidence of specific intent plus proof of conduct directed to accomplishing the unlawful design, or (2) from evidence of conduct alone, provided the conduct is also the sort from which specific intent can be inferred.' " *Id.* (citation omitted). Further, "proof of direct market power on the part of the defendant tends to support a finding of dangerous probability of success." *Id.*

In this case, Bally has presented evidence that IGT controls nearly 90% of the wheel game market. IGT has not refuted this evidence. Bally has also presented evidence that in the past, IGT has excluded others from the market by filing lawsuits alleging infringement of the allegedly invalid patents and forcing smaller companies to enter into agreements to cease infringement rather than continue with costly litigation as detailed below.

#### a. *IGT and WMS*

In 1999, IGT (Anchor) filed suit against WMS alleging that WMS had infringed the 932 patent. WMS filed antitrust counterclaims against IGT, just as Bally has done in this suit. Instead of pursuing costly litigation, the parties reached a settlement wherein IGT (Anchor) granted WMS a limited license to the allegedly infringed patents. The agreement also stated that WMS must obtain approval before seeking to develop any "secondary game using a mechanical or physical wheel or a video wheel."(# 365 at 10.) Anchor (now IGT) retains a veto power over any of WMS's designs.

#### b. *IGT and Aristocrat*

Bally also alleges that IGT excluded Aristocrat from the wheel game market. Aristocrat developed a game that implemented the claims in the allegedly invalid 646 patent. IGT sent Aristocrat a letter advising them to stop infringement or face a lawsuit. Rather than initiate costly litigation, Aristocrat entered into an agreement with IGT wherein Aristocrat agreed that it would not "make, have made, manufacture, use, sell, offer for sale,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 7
Slip Copy, 2007 WL 911773 (D.Nev.), 2007-1 Trade Cases P 75,687
**(Cite as: Slip Copy)**

lease import or otherwise place gaming machines in the Territory that incorporate a Wheel Feature" of the types described in the allegedly invalid patents for eight years. (*Id.* at 11.)The agreement also prohibited Aristocrat from challenging the 932 or 646 patents' validity.

### c. IGT and Mikohn

On May 13, 2004, Mikohn and IGT executed a Memorandum of Understanding that outlined a multiyear, multimillion dollar agreement under which Mikohn would provide IGT with signage and meters and license IGT certain patents, and IGT would "port," or modify for use upon its gaming platforms, several Mikohn games. (*Id.* at 12.)In June 2004, during further negotiations to finalize that agreement, IGT alleged that certain Mikohn games, including a Garfield-themed game, infringed the 932 wheel patent. (*Id.*) IGT allegedly told Mikohn that it would not enter into the proposed agreement unless Mikohn ceased its alleged infringement. On August 6, 2004, Mikohn and IGT executed the proposed agreement. Under a section titled "Settlement of Dispute with Respect to 5,823,874 and 5,848,932 Patents", IGT granted Mikohn a limited license to the identified patents that applied to existing Mikohn games on the market, certain revisions of those existing Mikohn games, and future Mikohn "Garfield" games. However, the license grant expressly excluded any games or revisions to games that included a secondary game using a mechanical, physical, or video wheel. (*Id.*) The agreement further prohibits Mikohn from making, using, or selling "any computer controlled gaming device that contains or comprises a bonus game which contains, comprises or makes use of a mechanical wheel, physical wheel, disc, globe, video wheel, Light Wheel, Light Box or Light Circle," other than the specified games that qualified for IGT's limited license. In addition, the agreement prohibits Mikohn from ever challenging the 932 or 646 patents' validity.

### d. IGT and J.P. Games

*8 Bally also alleges that IGT excluded J.P. Games from the wheel game market. In June 2006, IGT sales personnel identified certain wheel games manufactured by J.P. Games Inc. that were in use at Planet Hollywood casino.(*Id.* at 13.)On September 13, 2006, IGT sent J.P. Games a letter characterizing J.P. Games's activity as the "illegal conversion of IGT reel games" into wheel games and characterizing the games as "located to prey on the success of IGT's patent-protected 'WHEEL OF FORTUNE' games."(*Id.*) Less than two months later, IGT bought J.P. Games's rotator conversion business, including the games IGT accused of infringement, and expressly prohibited J.P. Games from competing in the wheel game market. (*Id.*)

In this case, Bally presents sufficient evidence of a dangerous probability of success within the relevant market to survive summary judgment. Bally has introduced evidence that IGT controls nearly 90% of the wheel game market and that IGT has consistently filed or threatened infringement suits against companies it claims have infringed the allegedly invalid patents in an effort to exclude them from the market. According to Bally, IGT has now commenced the same conduct against Bally. This evidence satisfies the Ninth Circuit's requirement "that the defendant patentee possessed or threatened to possess an ability to lessen competition in the market" through predatory means. *Handgards II,* 743 F.2d at 1294 (quoting *Handgards I,* 601 F.2d at 993 n. 13). IGT ultimately may prevail at trial, but Bally has demonstrated a genuine issue of material fact as to probability of success.

### 4. *Causal Antitrust Injury*

Proving antitrust injury is an essential element to a private action under the antitrust laws. *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 339 (1990). As a result, proof of antitrust injury "is often a dispositive issue in antitrust litigation." *Carter v. Variflex, Inc.,* 101 F.Supp.2d 1261, 1268 (C.D.Cal.2000) (citation omitted). Antitrust injury must be of the type that " 'the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.' " *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                  Page 8
Slip Copy, 2007 WL 911773 (D.Nev.), 2007-1 Trade Cases P 75,687
**(Cite as: Slip Copy)**

U.S. 477, 489 (1977)). However, a private cause of action does not arise until a private party is adversely affected by an anti-competitive aspect of the defendant's conduct. *See Atl. Richfield,* 495 U.S. at 339.

IGT moves for summary judgment because it alleges Bally cannot demonstrate a valid antitrust injury. IGT argues that Bally cannot show injury because (1) even if IGT's actions were exclusionary, they actually help Bally by reducing the overall competition in the wheel game market, and (2) Bally's litigation costs do not qualify as a valid antitrust injury. At the October hearing, Bally demonstrated that it had incurred litigation costs, but Bally did not sufficiently demonstrate an adverse affect on the market in general or a genuine issue of material fact as to an antitrust violation. Litigation costs do qualify as a valid antitrust injury for purposes of summary judgment if Bally can produce sufficient evidence to support a claim that IGT filed its patent infringement in bad faith. *See Carter,* 101 F.Supp.2d at 1270;*see also Rickards v. Belkin,* 783 F.2d 1329, 1335-36 (9th Cir.1986) (stating that litigation costs are cognizable antitrust injury so long as the plaintiff also demonstrates a "serious threat to competition").

*9 The first step in proving antitrust injury is showing that there is injury to competition. *See, e.g., Brown Shoe Co. v. United States,* 370 U.S. 294, 344 (1962) ("It is competition, not competitors, which the Act protects."). Consequently, the Court cannot presume antitrust injury from IGT's conduct, but instead Bally must demonstrate that its injury is attributable to an anti-competitive aspect of the practice under scrutiny. *See Atl. Richfield,* 495 U.S. at 329, 334. In other words, a plaintiff can only recover if its loss stems from a competition-reducing aspect of the defendant's behavior. *See id.* at 344.This requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for either damages or equitable relief."*Id.* at 343.After proving that the defendant engaged in activities proscribed by the antitrust laws, the plaintiff must show proximate cause and actual cause. Thus, the Court first analyzes whether IGT has engaged in any anti-competitive conduct and then whether Bally has suffered injury due to such conduct. *Carter,* 101 F.Supp.2d at 1268. Although the alleged antitrust injury need not be the sole cause of the injury claimed by plaintiff, it must be a material and direct cause. *Id.* (citation omitted).

Bally asserts that it suffered economic injury because it has incurred additional expenses relating to lost or delayed sales from customers who elected not to purchase from Bally due to Counterclaim Defendants' alleged threats. In addition, Bally asserts that it has incurred over $7,000,000 in litigation costs in defending against this action and will suffer additional research and development costs if IGT is successful in the enforcement of their patents because Bally will have to design a new instant canopy.

IGT argues that even if the above were true, Bally has not been "injured" because its sales have consistently increased. The parties do not dispute that Bally's revenues have increased since it first entered the wheel game market. IGT argues that the Court should award summary judgment on the antitrust claims on this basis alone. In some circumstances, a consistent increase in sales may negate the conclusion of injury caused by antitrust violations. *See King v. Idaho Funeral Serv. Ass'n,* 862 F.2d 744, 746 (9th Cir.1988) (affirming summary judgment on antitrust claims in part because the record reflected a consistent increase in sales throughout the entire period). However, in an antitrust suit based on bad faith infringement, the antitrust claimant may argue that litigation costs are a cognizable antitrust injury so long as the plaintiff also demonstrates a "serious threat to competition," by virtue of such litigation. *Rickards v. Belkin,* 783 F.2d 1329, 1335-36 (9th Cir.1986). As analyzed above, Bally has presented sufficient evidence to survive summary judgment on an antitrust action premised on IGT's bad faith enforcement of the allegedly invalid patents. During the October hearing, the Court told Bally that to survive summary judgment it must present evidence that IGT had taken actions to exclude others from the wheel game market. As detailed above, Bally has

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                         Page 9
Slip Copy, 2007 WL 911773 (D.Nev.), 2007-1 Trade Cases P 75,687
**(Cite as: Slip Copy)**

now presented evidence that based on the allegedly invalid patents, IGT threatened at least four competitors with infringement actions (WMS, Aristocrat, Mikohn, J.P Games, and now Bally) before threatening Bally, and IGT forced the smaller players to sign agreements wherein they agreed not to compete with IGT in the wheel game market. IGT controls nearly the entire wheel game market. With WMS, Aristocrat, Mikohn, and J.P. Games excluded from competing, Bally is essentially IGT's lone competitor. Thus, IGT's suits not only exclude IGT's only significant competitors, it also checks possible future competitors until the 646 and 932 patents are declared invalid. The Court concludes, therefore, that Bally's litigation costs satisfy the Brunswick test: "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful."429 U.S. at 489. It is alleged that Bally incurred these costs as a direct result of IGT's bad faith infringement actions, and as stated above, in an antitrust suit based on bad faith infringement, the antitrust claimant may argue that litigation costs are a cognizable antitrust injury so long as the plaintiff also demonstrates a "serious threat to competition." *Rickards,* 783 F.2d at 1335-36. Based on the above analysis, the Court finds that Bally has presented sufficient evidence to survive summary judgment on its antitrust claims based on IGT's alleged bad faith litigation.

5. *IGT's Release Agreement*

**\*10** Although not addressed at oral argument, IGT also argues that the Court should grant summary judgment in its favor because Bally has released IGT from any antitrust claims. In a prior action between IGT and Bally *(Alliance Gaming Corp. v. Int'l Game Tech.,* Case No. CV-S03-0965-PMP-PAL (D.Nev.2004)), Bally claimed that IGT violated the Sherman Act and Nevada Unfair Practices Act through (1) acquiring Anchor Gaming, (2) its patent pooling agreements, and (3) its discounts to certain customers. The parties settled the litigation pursuant to an agreement wherein Bally agreed to release IGT from any known claims Bally had against it:

*Antitrust Claim.*The Alliance Parties and their affiliates, for themselves and their successors and assigns, hereby release, acquit and forever discharge the IGT Parties, their affiliates, the John Does to the extent they are affiliated in any way with the IGT Parties and their respective officers, directors, employees, agents, representatives, shareholders, attorneys and their respective successors and assigns from any and all antitrust claims against the IGT Parties known by the Alliance Parties or their affiliates as of the Effective Date [March 31, 2004), including, without limitation, the claims raised in the Proposed Amended Complaint.

(# 172 at 9.) IGT argues that Bally cannot demonstrate antitrust injury because it released IGT from all antitrust claims, as noted in the above agreement. IGT argues this release prohibits Bally from filing an antitrust suit based on the following allegations (two of Bally's allegations upon which it bases its antitrust counterclaims): (1) IGT's purported anticompetitive conduct, and (2) IGT's alleged misrepresentations to the Court (Judge Pro) and to Bally in IGT's motion to dismiss Bally's 2002 declaratory judgment lawsuit.

Bally argues that it did not know about the alleged violations as of the release date, and therefore the release does not apply. First, IGT claims that its alleged anticompetitive conduct is excused by the release "because Bally in its discovery responses has failed to point to any such actions that occurred after March 31, 2004 ...." (# 173 at 10.) However, Bally recently received discovery documents relating to a lawsuit between IGT's former in house counsel (the "Van Asdale Litigation") and IGT, which supports Bally's claims it did not know about these claims when it signed the release. The Van Asdale litigation documents sustain Bally's argument that after IGT's agreement with Bally, IGT filed patent applications on patents IGT knew were invalid, and that it intended to enforce the invalid patents against Bally. Therefore, Bally argues that the release does not waive this conduct because Bally did not know about this conduct before March 31, 2004. Bally has alleged sufficient facts to create a genuine issue of material fact as to whether or not Bally knew about these acts and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 10
Slip Copy, 2007 WL 911773 (D.Nev.), 2007-1 Trade Cases P 75,687
**(Cite as: Slip Copy)**

alleged violations as of the release date, and therefore the Court declines to enter summary judgment based on the waiver.

### B. Counts IX and X-Violations of NRS § 598A.060

*11 The analysis for the Nevada claims does not differ from the federal claims. Nev.Rev.Stat. § 598A.060 (West 2006) ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."); *Boulware v. Nevada*, 960 F.2d 793, 800-01 (9th Cir.1992) ("The Nevada statute adopts by reference the case law applicable to the federal antitrust laws."). Therefore, in accordance with the above analysis, the Court denies IGT's Motion for Partial Summary Judgment as to these counts.

### C. Counts XI and XII-Walker Process Claim (and Nevada Equivalent)

Bally also alleges that IGT committed a "Walker Process" violation. To succeed on a Walker Process claim, the antitrust claimant must demonstrate:
(1) [Patentee] obtained the patent by knowingly and willfully misrepresenting facts to the PTO;
(2) the party enforcing the patent was aware of the fraud when bringing suit;
(3) independent and clear evidence of deceptive intent;
(4) a clear showing of reliance, i.e., that the patent would not have issued but for the misrepresentation or omission; and
(5) the necessary additional elements of an underlying violation of the antitrust laws.

*Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068-71 (Fed.Cir.1998). In addition, "all Walker Process allegations are subject to the pleading requirements of Fed.R.Civ.P. 9(b)." *Medimmune, Inc. v. Genentech, Inc.*, 427 F.3d 958, 967 (Fed.Cir.2005)."In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."Fed. R. Civ. Proc. 9(b); *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1106 (9th Cir.2003).

In its Motion for Partial Summary Judgment, IGT rests solely on its antitrust injury argument as to this claim. However, as discussed above, this argument fails for purposes of summary judgment. Thus, the Court denies IGT's Motion as it applies to the Walker Process claim. Even if IGT had offered other arguments, the record indicates that Bally has presented sufficient evidence to survive summary judgment as to this claim. Bally alleges and provides evidence that IGT knowingly misstated certain material prior art references to the PTO. Bally also alleges that but for these misstatements, the PTO Examiner would not have issued the allegedly invalid patents at issue in the antitrust counterclaims. Moreover, as discussed above, Bally has demonstrated that a material fact exists as to each element of its bad faith claims; thus, the Court denies summary judgment as to this claim.

### D. Bally's Antitrust Claims in the Broader Gaming Machine Market

In its pleadings, Bally originally based its antitrust counterclaims on IGT's behavior in two alleged markets-the gaming machine market and the wheel game market. As noted above, at the October hearing, the Court ordered Bally to demonstrate evidence of harm to the market to survive summary judgment. However, Bally has now focused entirely on the wheel game market. Bally has not presented any evidence that IGT has committed an antitrust violation in the entire gaming machine market. IGT asks the Court to grant summary judgment on this abandoned theory pursuant to Federal Rule of Civil Procedure 56(d).*See Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 391 (7th Cir.2002) (stating that Rule 56(d) allows the court to grant partial summary judgment on less than the whole claim); *see also Hynix Semiconductor, Inc. v. Rambus, Inc.*, No. CV-00-20905 RMW, 2006 U.S. Dist. LEXIS 48105, at *8-10 (N.D.Cal. July 6, 2006) (granting summary adjudication pursuant to Rule 56(d) on those aspects of plaintiff's monopolization and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                       Page 11
Slip Copy, 2007 WL 911773 (D.Nev.), 2007-1 Trade Cases P 75,687
**(Cite as: Slip Copy)**

attempted monopolization claims based on one of the defendant's devices because plaintiff failed to prove that the device had achieved sufficient market power); *Phase Four Indus. v. Marathon Coach, Inc.,* No. C 04-04801 JW, 2005 U.S. Dist. LEXIS 25387, *17 (N.D.Cal. Oct. 20, 2005) (granting defendant patentholder's motion for partial summary judgment on two of the bases for claimed invalidity-priority of inventorship and derivation-because plaintiff could not sufficiently prove prior conception or communication of an enabling disclosure). Because Bally has not presented any evidence as to the gaming machine market as a whole, the Court grants IGT's Motion for Partial Summary Judgment as it relates to all claims in the gaming machine market.

### Count XI-Lanham Act

**\*12** To prevail on its Lanham Act counterclaim, Bally must prove the following elements: (1) IGT made a false statement of material fact regarding its lawsuit; (2) IGT's statement actually deceived the public or had a tendency to do so; and (3) Bally has been injured by and suffered damages as a result of IGT's alleged statement. *Zenith Elect. Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1348, (Fed.Cir.1999).

#### A. False Statement of Fact

In its press release, IGT stated, *inter alia,* that it had filed a patent infringement lawsuit against Bally "to stop [Bally] from misappropriating IGT's patented innovations in the areas of bonus gaming features ...." (# 173 at 18.) As discussed above, a genuine issue of material fact exists as to whether IGT knew the patents were invalid. Accordingly, this element favors Bally.

#### B. Actual Deceit or Tendency to Deceive the Public

The Ninth Circuit has noted that "[i]t is not easy to establish actual consumer deception through direct evidence."*U-Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1041 (9th Cir.1986). Further, when evidence exists that the defendant intentionally misled the public, courts presume that the statements deceived the public. *William H. Morris Co. v. Group W, Inc.,* 66 F.3d 255, 258-59 (9th Cir.1995) (citation omitted). As discussed above under the bad faith infringement counterclaim, Bally has presented sufficient evidence to survive summary judgment that IGT knew some of the patents at issue in this case were invalid. Thus, publishing statements on its website that Bally infringed the alleged invalid patents indicates that IGT intentionally misled the public. IGT argues that any presumption only exists if the defendant expended substantial funds to disseminate the allegedly false information. However, the Ninth Circuit has stated that regardless of the money spent, so long as the plaintiff intentionally misled the public and the message reached the relevant consumers or competitors, the presumption applies. *See id.* at 258 n. 2. IGT issued a press release on its website. Bally has presented evidence that IGT received numerous inquiries regarding the press release and that some of Bally's customers called Bally to clarify IGT's statements. Accordingly, Bally has demonstrated a material question of fact as to whether IGT's statement deceived or tended to deceive the public.

#### C. Injury

Bally alleges it suffered injury due to IGT's statements. Specifically, Bally argues that at least one of its customers, Multimedia Games, backed out of an order with Bally for 100 Bally "top boxes" as a direct result of the pending IGT litigation. To support this claim, Bally introduced an email from Multimedia to Bally informing Bally to put the orders on hold due to Bally's "legal issues." (# 359, Ex. 19.) Unlike the antitrust claims, Bally is not required to establish injury to competition or the market; thus, if true, this alleged harm could establish the injury requirement for the Lanham Act. IGT counters by introducing evidence implying that Bally actually breached the contract with Multimedia and cancelled the contract unilaterally. (*See* # 192 at 172:3-6.) Both parties have introduced contradicting evidence upon which a reasonable juror could base a decision. Thus, at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                           Page 12
Slip Copy, 2007 WL 911773 (D.Nev.), 2007-1 Trade Cases P 75,687
**(Cite as: Slip Copy)**

the summary judgment stage, Bally has presented specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 248 (1986). The Court therefore denies IGT's Motion for Summary Judgment as it relates to Bally's Lanham Act claim.

### D. Intentional Interference With Prospective Business Advantage

*13 To succeed on its intentional interference with prospective business advantage claim, Bally must demonstrate the following: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct. *See, e.g., Leavitt v. Leisure Sports, Inc.,* 734 P.2d 1221, 1225 (Nev.1987).

IGT asks the Court to grant summary judgment as to this claim because Bally has failed to present evidence that it suffered any injury due to IGT's actions. However, as discussed above, Bally has presented evidence that Multimedia ceased contractual relations with Bally due to IGT's statement that Bally was infringing its patents. However, while Bally has presented evidence of a contract or a prospective contract and actual harm, Bally has not presented any evidence that IGT knew about the Multimedia/Bally contractual relationship when it issued its press release. In its Counterclaim, Bally alleges that IGT was "aware that Bally ha[d] prospective contractual relationships with third parties based on its ability to manufacture and sell gaming machines without facing exposure to patent litigation."(# 25 at 33.) At the summary judgment stage, Bally focused on the contractual relationship with Multimedia, yet it failed to introduce any evidence that IGT knew about this relationship. As the party opposing IGT's Motion, Bally may not rest upon mere allegations or denials in its pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 248. Accordingly, the Court grants IGT's Motion for Summary Judgment with respect to Bally's claim for intentional interference with prospective economic advantage. *See Carmen v. S.F. Unified Sch. Dist.,* 237 F.3d 1026, 1028-31 (9th Cir .2001) (noting a district court need not comb the record looking for a genuine issue of material fact where the party has not brought the evidence to the court's attention).

### CONCLUSION

Pursuant to the above analysis, IT IS HEREBY ORDERED that IGT's Motion for Partial Summary Judgment (# 167) is *granted in part* and *denied in part.* The Court *grants* IGT's Motion as it relates to Bally's antitrust claims (Counts VII, VIII, IX, X, XII, and XIII) in the broader gaming machine market. The Court further *grants* IGT's Motion with respect to Count XIV-intentional interference with prospective business advantage. The Court *denies* IGT's Motion for Partial Summary Judgment as to Counts VII, VIII, IX, X, XII, and XIII as they relate to the wheel game market, and the Court further *denies* IGT's Motion with respect to Bally's Lanham Act claim.

D.Nev.,2007.
IGT v. Alliance Gaming Corp.
Slip Copy, 2007 WL 911773 (D.Nev.), 2007-1 Trade Cases P 75,687

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.