# Exhibit P

**Westlaw.**

Not Reported in F.Supp.                                                                                                   Page 1
Not Reported in F.Supp., 1997 WL 790576 (S.D.N.Y.), 1998-1 Trade Cases P 72,042, 45 U.S.P.Q.2d 1342
**(Cite as: Not Reported in F.Supp.)**

C
Telebrands Corp. v. Media Group, Inc.
S.D.N.Y.,1997.

United States District Court, S.D. New York.
TELEBRANDS CORP., Plaintiff,
v.
The MEDIA GROUP, INC., Defendant.
**No. 97 Civ. 6768(RPP).**

Dec. 24, 1997.

Cooper & Dunham, LLP, New York, City, By: Robert D. Katz, Robert T. Maldonado, Vincent A. Sireci, for plaintiff.
Arent, Fox, Kintner, Plotkin & Kahn, New York, City, By: Hunter T. Carter, Michael S. Cryan, D. Reed Freeman, for defendant.

**OPINION AND ORDER**
PATTERSON, J.
*1 On October 31, 1997, plaintiff Telebrands Corp. ("Telebrands") moved for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) to enjoin defendant The Media Group, Inc. ("Media Group") from alleged false advertising.

**Background**

Telebrands markets a patented hand-held can opener, SAFETY CAN, that opens cans by cutting through the rim of the lid so that no sharp edges are left on either the lid or the rim of the opened can.
In December 1996, Telebrands invested in an extensive national television advertising campaign to promote SAFETY CAN through direct response orders to a 1-800 telephone number. The vast majority of the sales of SAFETY CAN, however, have been through retail outlets in "AS SEEN ON T.V." packaging. There have been over 1,900,000 such orders to date. (Khubani Decl. ¶ 9). Telebrands's remaining sales have been through direct response orders, of which there have been over 300,000 to date. (*Id.*).

Since November 1996, defendant Media Group has marketed a food-browning microwave bag known as BROWN 'N CRISP through a thirty minute television "infomercial." (Howard Decl. ¶ 9). In July 1996, Media Group amended its infomercial to offer a side-cutting hand-held can opener as one of two free premiums to customers who purchase the BROWN 'N CRISP bags.[FN1] (*Id.*). The can opener is available in approximately half the markets where BROWN 'N CRISP is sold, but does not affect the price of the BROWN 'N CRISP bags, which is $29.95 with or without it. (*Id.*). The defendant's can opener is advertised as leaving the lid of the can smooth. Because the can opener cuts through the side of the can beneath the rim, however, it leaves the rim of the opened can as sharp as the edge of a lid cut by a conventional top-cutting can opener. (Sahay Reply Decl. ¶ 3).

FN1. Defendant also offers a slicer-dicer called KITCHEN WIZARD as a free premium.

Three short segments, totaling approximately thirty seconds of the thirty minute BROWN 'N CRISP infomercial at issue, promote the side-cutting can opener.[FN2] The infomercial begins with the announcement "Stay tuned to see how you can get this amazing new, side-winding can opener, with the lid that's totally safe. It's a $15.00 value, and it's yours, absolutely free." (Howard Decl. ¶ 4). The scenes that accompany this initial voice over show a woman opening a can with the hand-held can opener, then show the lid of a can rolled across a woman's arm, and finally show the can opener itself with the word "FREE" above it. (*Id.* ¶ 5). At this point, a small inset appears in the lower left quarter of the screen, in which the viewer sees a person place the lid back on the can and place the can into a refrigerator. (*Id.*). At two later points in the thirty

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.    Page 2

Not Reported in F.Supp., 1997 WL 790576 (S.D.N.Y.), 1998-1 Trade Cases P 72,042, 45 U.S.P.Q.2d 1342
**(Cite as: Not Reported in F.Supp.)**

minute infomercial, the can opener is again displayed, immediately before viewers are instructed how to order the BROWN 'N CRISP bags: "But if you order today, during this special TV offer, you will also receive the side-winding can opener. Sharp lids become a thing of the past, and it's yours free." (*Id.* ¶ 6). Meanwhile, the commercial shows a woman opening a can with the hand-held can opener, followed by a woman rolling the lid across her arm, followed finally by a shot of the can opener. (*Id.* ¶ 7).

> FN2. This version of the can opener segments of the BROWN 'N CRISP infomercial will be referred to as the "first version."

*2 Plaintiff objects to defendant's claims that the "can opener ... leaves the lid totally safe" and that "[s]harp lids become a thing of the past" in that it implies that a person using this hand-held can opener will be handling cans that are not left in an unsafe condition.[FN3] The complaint asserts claims for false advertising in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and for unfair competition under New York law.

> FN3. Plaintiff also objects to the scenes showing a woman rolling the lid of the opened can across her arm and the scene showing the lid of the can being placed on top of an opened can that is then placed in the refrigerator. It argues that these scenes are almost identical to scenes in its own television commercial, and thus would tend to confuse a viewer who had seen plaintiff's television advertisements. However, it does not seek injunctive relief on this ground since no evidence of consumer confusion has been submitted.

Plaintiff's survey expert performed a consumer perception study to determine the message consumers take away from the first version of the can opener scenes in the BROWN 'N CRISP commercial. (O'Neill Decl. ¶ 2). The results of the survey suggest that some consumers viewing those segments get the misleading impression that the can opener is safe to use in that it leaves cans without sharp edges on either the lid or the rim of the opened can. (*Id.* ¶ 12). Defendant contests the methodology of the survey, claiming that the order in which the questions were asked was misleading, and that because the respondents were shown only the can opener segments, and not the entire thirty minute commercial, the message taken away was magnified in comparison to the message consumers actually are likely to receive from viewing the entire commercial. (Def. Mem. at 8-10).

By November 25, 1997, the time of the scheduled evidentiary hearing,[FN4] defendant had withdrawn the first version of the can opener segments of its commercial as of November 24, 1997. The version of the can opener segments substituted in its place ("second version"), which was scheduled to air beginning approximately December 1, 1997, does not contain the scenes showing the can lid being rolled across an arm or the scene of the can being placed into a refrigerator. (Howard 2d Decl. ¶ 5). [FN5] Moreover, the defendant has removed the offensive claims that the "can opener ... leaves the lid totally safe" and that "[s]harp lids become a thing of the past."

> FN4. The parties were offered the opportunity to conduct an evidentiary hearing, but instead argued the motion from the papers submitted.

> FN5. The Second Declaration of Herman S. Howard was first made available to the Court at the oral argument on this motion.

The voice over now states "Stay tuned to find out how you can get this amazing new side-cutting can opener. It's a $15.00 value, and it's yours absolutely free." The video shows a woman opening a can with the can opener, followed by a different scene of a woman opening a can, followed by a scene of the can as a woman replaces the lid. (*Id.* ¶ 4). Next comes a scene showing the can opener resting on a counter, while an inset in the lower left of the screen shows the can with a hand picking it up. The inset is replaced by words at the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                           Page 3
Not Reported in F.Supp., 1997 WL 790576 (S.D.N.Y.), 1998-1 Trade Cases P 72,042, 45 U.S.P.Q.2d 1342
**(Cite as: Not Reported in F.Supp.)**

bottom of the screen which state "Use caution when opening. Rim of can may be sharp." (*Id.*). This statement appears on the screen for five seconds. (*Id.*). In the second segment, the voice over states " But if you order today, during this special tv offer, you'll also receive this new side-cutting can opener. It's a $15.00 value and it's yours free." (*Id.*). Except for minor variations, the same video sequences appear here as appeared in the first segment. (*Id.*).

**Discussion**

*3 In order to obtain injunctive relief, the party seeking a preliminary injunction must demonstrate (1) that there will be irreparable harm in the absence of the injunction; and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them fair grounds for litigation, and a balance of hardships tipping decidedly in the movant's favor. *See Fisher-Price, Inc. v. Well-Made Toy Manufacturing Corp.,* 25 F.3d 119, 122 (2d Cir.1994); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

**A. Irreparable Harm**

To demonstrate that defendant's false advertising will cause irreparable harm, plaintiff must "offer something more than a mere subjective belief that [it] is likely to be injured as a result of the false advertising; [it] must submit proof which provides a reasonable basis for that belief." *The Coca-Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 316 (2d Cir.1982) (citations omitted).[FN6]

> FN6. The opinion continues: "[t]he likelihood of injury and causation will not be presumed, but must be demonstrated in some manner." Coca-Cola, 690 F.2d at 316; *see McNeilab, Inc. v. American Home Products Corp.,* 848 F.2d 34, 38 (2d Cir.1988) (discussing fact that *Coca-Cola* court refused to presume irreparable harm, but required it to be demonstrated); *see also Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 696 (2d Cir.1994) ("While there may be room for ... a presumption [of harm] in cases where there is a question of false designation of goods, our circuit has expressly disfavored presumptions of harm in cases where the products are not obviously in competition or where the defendant's advertisements make no direct reference to any competitor's products.") (citing *Coca-Cola* and *McNeilab*).

*Coca-Cola* stands for the proposition that a finding of irreparable harm is warranted in a context where the parties are direct competitors and some evidence is adduced to suggest that consumers are misled by defendant's advertising.[FN7] *See id.* at 316-17. As the *Coca-Cola* court reasoned, if consumers are misled by defendant's advertising into believing something about the product that makes it more desirable than it would otherwise be, and if plaintiff and defendant are direct competitors, then it is likely that plaintiff will lose business because consumers will unfairly choose defendant's product over plaintiff's. *See id.* at 317.

> FN7. In comparison, a presumption of irreparable harm may be warranted in other contexts. *See, e.g., McNeilab, Inc. v. American Home Products Corp.,* 848 F.2d 34, 38 (2d Cir.1988) (presumption of irreparable harm warranted in context of false comparative advertising); *Telebrands Corp. v. Wilton Industries, Inc.,* No. 97 Civ. 6250(RPP), 1997 WL 691433, at *4-*5 (S.D.N.Y. Nov.5, 1997) (presumption of harm warranted in context of direct competitors in unique market where offensive advertising was false on its face and was material misstatement).

Both plaintiff and defendant market a side-cutting hand-held can opener. Plaintiff sells its product, SAFETY CAN, while defendant "gives away" its can opener to customers who purchase its BROWN 'N CRISP microwave bags. SAFETY CAN is advertised on television, but is offered for sale main

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                Page 4
Not Reported in F.Supp., 1997 WL 790576 (S.D.N.Y.), 1998-1 Trade Cases P 72,042, 45 U.S.P.Q.2d 1342
**(Cite as: Not Reported in F.Supp.)**

ly in retail stores. (Khubani Decl. ¶ 9). Defendant's can opener, in comparison, is only available to customers who respond directly to defendant's television commercial, and is not available in retail stores. (Def's Mem. at 4). In order to find that plaintiff and defendant are direct competitors, it is necessary to conclude that some consumers will see defendant's television advertising and be induced to purchase the BROWN 'N CRISP microwave bags because of the free hand-held can opener. The Second Declaration of Herman S. Howard reveals that when defendant offers the hand-held can opener as a free premium, it sells 10% more of its BROWN 'N CRISP bags. (Howard 2d Decl. ¶ 6). Thus, it is fair to conclude that at least some consumers will purchase defendant's product because the free can opener is included. Once the consumer has obtained defendant's can opener, he or she will be unlikely to purchase a second can opener. In this way, defendant's can opener directly affects the market for plaintiff's SAFETY CAN.

**\*4** The results of plaintiff's market survey shows that some consumers are misled by defendant's advertising. Participants in the survey were shown a video consisting of the first version of the can opener segments from defendant's BROWN 'N CRISP infomercial and were then asked five questions. The first question asked the respondents what the main message of the video was. The answers were recorded verbatim and followed up with neutral probes for more information. The second question asked "[d]id the video say anything about the safety of the can opener, or was this *not* mentioned, or do you *not* recall what was said." If a respondent answered that the video did mention the safety of the can opener, he or she was asked specifically what the video said. The third question asked whether the video mentioned anything about the availability of the can opener in different colors.[FN8] The fourth question asked "[d]id the video say anything about the edge of the *can* after it has been opened, or was this *not* mentioned, or do you *not* recall what was said." If the respondent answered that the video did mention the edge of the can, he or she was asked what specifically the video said. Finally, the fifth question asked "[d]id the video say anything about the edge of the *lid* after the can has been opened, or was this *not* mentioned, or do you *not* recall what was said." If the respondent answered that the video mentioned the lid, he or she was again asked what the video said. (McNeill Decl., Ex. 1, App. A).

> FN8. This question was thrown in to test whether respondents actually were answering based on their impressions of the video or were guessing the answers.

In response to the first question which asked about the main message of the video, 20% of survey respondents answered that the main message is "will not cut yourself/can't cut yourself." (*Id.*, Ex. 1 at 11 (Table 1)). Furthermore, when asked whether the video said anything about the edge of the can after it has been opened, some respondents answered either "can is not sharp/no sharp edges/dull," "it is smooth/no jagged edges," "will not cut you/can't cut yourself," or "it's safe." (*Id.* ¶ 11; Ex. 1 at 13 (Table 3)). If this survey is reliable, then at least some potential customers are getting the misleading impression that it is impossible to cut oneself after use of defendants's product or that the defendant's can opener leaves the rim of the opened can smooth.[FN9] These impressions are incorrect. Defendant's can opener leaves the rim of the opened can as sharp as the lid of a can opened by a conventional top-cutting can opener, and thus it is possible for consumers to cut themselves. (Sahay Reply Decl. ¶ 3). The false impression imparted by defendant's advertising may make the defendant's can opener appear more favorable in the eyes of the consumers and induce consumers to obtain the can opener for this reason. Because plaintiff and defendant are direct competitors, a can opener obtained from defendant in this manner will result in the loss of a potential sale of plaintiff's SAFETY CAN, causing plaintiff irreparable harm.

> FN9. In comparison, plaintiff's SAFETY CAN actually does leave both the rim of the opened can and the lid smooth.

**\*5** Of course, the validity of the above conclusions depends on the reliability of plaintiff's survey.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                    Page 5

Not Reported in F.Supp., 1997 WL 790576 (S.D.N.Y.), 1998-1 Trade Cases P 72,042, 45 U.S.P.Q.2d 1342
**(Cite as: Not Reported in F.Supp.)**

While the sample size is relatively small,[FN10] judging only from the category of respondents who answered that the video's main message was "will not cut yourself/can't cut yourself," it is possible to conclude that at least one in five respondents (20% or around 41 people) were misled.[FN11] (McNeill Decl., Ex. 1 at 11 (Table 1). The Court cannot conclude that one in five respondents is an insignificant number.

> FN10. Of the interviews conducted in five different shopping malls across the country, only 203 interviews were validly completed. (McNeill Decl. ¶ 3). Compare that number with the 500 who participated in the study utilized in *Coca-Cola*. Although the district court in that case agreed with the defendant that the plaintiff's survey was lacking in other respects, it did not find fault with the sample size, which the defendant's own expert agreed was reasonable. *See The Coca-Cola Co. v. Tropicana Products, Inc.,* 538 F.Supp. 1091, 1096 (S.D.N.Y.1982). The Second Circuit decision in *Coca-Cola,* while disagreeing with the district court on other grounds, did not dispute the trial court's findings as to the validity of the survey. *See The Coca-Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 317 (2d Cir.1982); *see also Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. SmithKline Beecham Corp.,* 960 F.2d 294, 299 (2d Cir.1992) (utilizing survey consisting of 300 respondents from eight different shopping malls). In other cases, however, smaller surveys have been sufficient.

> FN11. As stated above, these respondents were misled because, in actuality, it is possible to cut oneself after use of the defendant's product due to the fact that use of the defendant's can opener leaves the rim of the opened can as sharp as the lid of a can opened with a conventional top-cutting can opener. (Sahay Reply Decl. ¶ 3).

The context in which consumers are likely to view the commercial confirms the reliability of the survey's conclusion that some consumers are misled by defendant's advertising. In this country, prior to SAFETY CAN's introduction to the market, hand-held can openers opened cans in a manner that almost universally left a lid with a sharp edge and a can with a smooth rim.[FN12] Defendant's advertisement informs the public that its "amazing new" hand-held can opener leaves a safe lid, but does not warn the public that by doing so, the can rim, which is left smooth by an ordinary hand-held can opener's operation, is now sharp.[FN13] No warning of this situation is given to the consumer viewing the advertisement.[FN14] Accordingly, the consumer is misled into believing the sharp lid problem, associated with the use of traditional can openers, has been remedied while the smoothness of the rim remains unaffected. Therefore, the evidence that some respondents took away the message from the video that they "will not cut [themselves]/can't cut [[[themselves]" is not unsupportable.

> FN12. SAFETY CAN leaves both the lid and the rim of the can smooth because it cuts through the rim of the can.

> FN13. Defendant's can opener leaves the rim sharp because it cuts through the side of the can beneath the rim.

> FN14. Defendant does include warnings that the rim of the can may be sharp on the actual can opener and on the instruction sheet included with the can opener. (Howard Decl. ¶ 14). However, by the time the consumers read these warnings, they have already received the product. Defendant's second version of its advertisement corrects this problem with an on-screen warning. (Howard 2d Decl. ¶ 4). The second version of defendant's commercial is discussed below.

Defendant has questioned the reliability of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.    Page 6

Not Reported in F.Supp., 1997 WL 790576 (S.D.N.Y.), 1998-1 Trade Cases P 72,042, 45 U.S.P.Q.2d 1342
**(Cite as: Not Reported in F.Supp.)**

survey on the grounds that the order in which the questions were asked was misleading to the respondents. It argues that the responses to the fourth question, which asked whether the video said anything about the edge of the can after opening, should not be given great weight for this reason. In response to the fourth question, approximately 124 people believed the video did mention something about the edge of the can after opening. When asked what was said, 55 people (or around 27% of the total sample of 203) answered that the can is not sharp/no sharp edges/dull, 38 people (or around 19% of the total sample) answered that the edge of the can is smooth/no jagged edges, 32 people (or around 16% of the total sample) answered that the edge of the can will not cut you/can't cut yourself, and 19 people (or around 9% of the total sample) answered that the edge of the can is safe. (*Id.*, Ex. 1 at Table 3).[FN15] If these responses are credited, there is further evidence that some respondents are misled by defendant's advertising into believing that the edge of the opened can is left smooth.[FN16] The Court agrees with defendant, however, that the order of questions may be misleading, and for this reason does not base its conclusions on the responses given to the fourth question.

> FN15. These figures were calculated by the Court. Table 3 of plaintiff's survey report indicates that, of the 203 total respondents, 61%, or around 124 people, answered yes to the question that asked whether the video said anything about the edge of the can after it had been opened. Plaintiff calculated the percentage of the respondents whose answers fell into each of the categories described above based on this number (124), rather than based on the total number of respondents (203). (McNeill Decl., Ex. 1, at 13 (Table 3)). Therefore, the Court translated plaintiff's percentages into absolute numbers and then translated each of those absolute numbers into a percentage of the *total* number of respondents in order to get a better impression of how many of the total number who viewed the video associated the edge of the can with smoothness.

> FN16. Exactly how many people were misled in this way is hard to pinpoint. Because respondents were allowed to give multiple answers, there could be, and probably is, considerable overlap in the number of respondents whose answers fell into each category, making the results less significant.

The problem with the order of questions is that there may have been some respondents who answered the fourth question about the edge of the can after opening by mentioning the more general impressions of smoothness that they received from the video.[FN17] Because the respondents were unaware at the time they answered the fourth question that the next question would ask specifically about the lid, some respondents may have offered what they remembered from the video about smoothness in response to the fourth question, but would not have otherwise responded in this way had the order of the questions been reversed. If the question about the lid had been asked *before* the question about the edge of the can, respondents could have focused on a source of smoothness actually referred to in the commercial, the lid. Then, when asked the next question about the edge of the can, respondents would have been unlikely to associate their general impressions of smoothness with the can edge unless they really *had* gotten the impression from the commercial that the can opener left the edge of the can smooth.[FN18]

> FN17. That respondents may have had general impressions of smoothness in their minds is probable in light of the fact that several scenes of the video showed a person running a lid of a can across her arm.

> FN18. This flaw seems more probable in light of the fact that both the first question, which asked about the main message of the video, and the second question, which asked about the safety of the can opener, garnered many responses that fell into the categories of safety and smoothness, including some direct references to the lid

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 7
Not Reported in F.Supp., 1997 WL 790576 (S.D.N.Y.), 1998-1 Trade Cases P 72,042, 45 U.S.P.Q.2d 1342
**(Cite as: Not Reported in F.Supp.)**

in particular, yet no respondents mentioned the *rim of the can* specifically. (McNeill Decl., Ex. 1, at 11-12 (Tables 1 & 2)). This could support the theory that respondents were merely offering general impressions of smoothness in response to the fourth question. Alternatively, it could have been the fourth question itself, which asked about the edge of the can after opening, that put into people's minds the false impression that the video mentioned the rim of the can.

*6 Alternatively, respondents could have interpreted the phrase "the edge of the can" to refer to the lid-after all, the lid is a part of the can-and answered the fourth question in the affirmative for this reason.[FN19] If the question about the lid had been asked *before* the question about the edge of the can, it would have been clear to the respondents that "the edge of the can" referred only to the rim of the can, not to the lid. These observations undermine the conclusion that a number of respondents received the impression from defendant's commercial that the defendant's can opener leaves the rim of the opened can smooth.

> FN19. In fact, at least 2 respondents *did* answer this fourth question, which asked what the video said about the edge of the can, by responding with "no sharp edges on *lid.*" (McNeill Decl., Ex. 1, at 13 (Table 3) (emphasis added)).

While recognizing the survey's limitations, this Court cannot conclude that it does not merit consideration. *See Coca-Cola,* 690 F.2d at 317 (relying on survey with recognized flaws to support finding of irreparable harm where court concluded a not insubstantial number of consumers were clearly misled). Because of the evidence that suggests that 20% of respondents took away "will not cut yourself/can't cut yourself" as the main message of the video, [FN20] it is clear that at least a small number of consumers are clearly misled. Therefore, because plaintiff and defendant are direct competitors, and because plaintiff has provided evidence that consumers are misled by defendant's advertising, plaintiff has offered proof that it has suffered irreparable harm. *See id.*

> FN20. This was in response to the first question and therefore the result is not affected by the misleading order of questions.

**B. Likelihood of Success on the Merits**

To succeed on a Lanham Act false advertising claim, plaintiff must demonstrate both that the advertising complained of is either literally or implicitly false and that the false statement is material in that it pertains to an inherent quality or characteristic of the product. *See Coca-Cola,* 690 F.2d at 317-18; *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.,* 906 F.Supp. 178, 181 (S.D.N.Y.1995), *aff'd* 100 F.3d 943 (2d Cir.1996); *Tripledge Products, Inc. v. Whitney Resources, Ltd.,* 735 F.Supp. 1154, 1163 (E.D.N.Y.1990).

Here defendant's commercial does not contain a literally false statement. In order to conclude that defendant's advertising is implicitly false, courts look to public reaction to determine whether consumers are misled. *See Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. SmithKline Beecham Corp.,* 960 F.2d 294, 297-98 (2d Cir.1992); *Coca-Cola,* 690 F.2d at 317; *SmithKline,* 906 F.Supp. at 181; *Tripledge Products;* 735 F.Supp. at 1164.

The survey discussed above is useful for this purpose. While its results should be discounted slightly, it does suggest that a significant percentage of consumers are misled into believing they cannot cut themselves after use of defendant's product. [FN21] Thus, defendant's advertising is implicitly false.

> FN21. Although defendant requested and was granted permission for an adjournment for the purpose of conducting its own consumer perception survey, no such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 8
Not Reported in F.Supp., 1997 WL 790576 (S.D.N.Y.), 1998-1 Trade Cases P 72,042, 45 U.S.P.Q.2d 1342
**(Cite as: Not Reported in F.Supp.)**

survey was ever submitted to the Court.

In addition to being implicitly false, the misrepresentation in question must pertain to an inherent quality or characteristic of the product such that it constitutes a material misstatement. *See Vidal Sassoon, Inc. v. Bristol-Myers Co.,* 661 F.2d 272, 278 (2d Cir.1981). That requirement is met here because an inherent characteristic of a can opener is the state in which it leaves the opened can and lid.

*7 In the First Declaration of Herman S. Howard, Mr. Howard, the president of Media Group, states that he was aware at the time he decided to offer a can opener as a free premium that plaintiff Telebrands had been involved in a lawsuit with another company, E. Mishan & Sons ("Mishan"), and that Telebrands had received an injunction against Mishan's can opener. (Howard Decl. ¶¶ 10-15). Mr. Howard further states that, to avoid the mistakes of Mishan, he purposely chose a can opener that looks different than SAFETY CAN, structured his commercial to avoid making false claims about the lid of the opened can, and included a written warning about the sharpness of the rim along with his product. (*Id.* ¶ 14). Because he was familiar with the Mishan opinion (*id.*), Mr. Howard was aware that this Court considered it significant that Mishan's television advertising failed to mention that the rim of the opened can is sharp. *See Telebrands Corp. v. E. Mishan & Sons,* 97 Civ. 1414 (RPP), 1997 WL 232595, at *9 (S.D.N.Y. May 7, 1997). Moreover, that opinion made it clear that the sharpness of the rim is a material factor which can influence a consumer's purchasing decision. *See id.* Accordingly, Mr. Howard took a deliberate risk when structuring his commercial as he did.

Because plaintiff has demonstrated both likelihood of success on the merits and irreparable harm, a preliminary injunction is warranted. Therefore, defendant is hereby enjoined from running the first version of the can opener segments of its television commercial and is ordered to require the return of the copies of this version from the television stations to which they were distributed. No other injunctive relief is appropriate since it appears that plaintiff can recover monetary damages for the losses it has sustained from defendant's utilization of the first version of its commercial which ran from July 1997 until November 24, 1997. This case is somewhat unique in that monetary damages appear to be provable. Throughout the time period that defendant was running the infomercial containing the first version of the can opener segments, it was simultaneously running another version of its infomercial that did not contain the can opener segments. (Howard Decl. ¶ 9). Defendant sold 10% more of its product when the can opener was offered. (Howard 2d Decl. ¶ 6). Therefore, a reasonable evaluation of the amount of sales that defendant unfairly gained because of its false advertising appears to be feasible.[FN22]

> FN22. Of course, the calculation of damages would have to take into account other factors-for example, the plaintiff's market share of the side-cutting, hand-held can opener industry.

As to the second version of the can opener segments of defendant's commercial, a preliminary injunction is not warranted. Defendant has removed all the offensive scenes and statements complained about by plaintiff. Plaintiff has not shown that it will be irreparably harmed by this second version, and has not provided any evidence that consumers are misled by it. Therefore, defendant is free to utilize the second version of its advertisement.

Defendant's motion to transfer venue is denied. Defendant has not met its burden of demonstrating that the convenience of the parties and witnesses, judicial efficiency, or the interests of justice weigh in favor of upsetting plaintiff's choice of forum. *See Linzer v. EMI Blackwood Music, Inc.,* 904 F.Supp. 207, 216 (S.D.N.Y.1995); *Dwyer v. General Motors Corp.,* 853 F.Supp. 690, 692 (S.D.N.Y.1994).

### Conclusion

*8 Defendant is preliminarily enjoined from running the first version of the can opener segments

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 9

Not Reported in F.Supp., 1997 WL 790576 (S.D.N.Y.), 1998-1 Trade Cases P 72,042, 45 U.S.P.Q.2d 1342
**(Cite as: Not Reported in F.Supp.)**

of its television commercial and is ordered to require the return of the copies of this version from the television stations to which they were distributed. Plaintiff is ordered to post a bond in the amount of $1,000 as security no later than December 29, 1997. Defendant's motion to transfer venue is denied.

IT IS SO ORDERED.

S.D.N.Y.,1997.
Telebrands Corp. v. Media Group, Inc.
Not Reported in F.Supp., 1997 WL 790576 (S.D.N.Y.), 1998-1 Trade Cases P 72,042, 45 U.S.P.Q.2d 1342

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.