UNITED STATES DISTRICT COURT
SOURTHERN DISTRICT OF NEW YORK

──────────────

№ 07 Civ. 8379 (RJS)

──────────────

THE PROCTER & GAMBLE COMPANY,

Plaintiff,

VERSUS

ULTREO, INC.,

Defendant.

──────────────

MEMORANDUM AND ORDER
August 28, 2008

──────────────

RICHARD J. SULLIVAN, District Judge:

Plaintiff The Procter and Gamble Company ("P&G"), the manufacturer of Oral B toothbrushes and dental care products, brings this action against defendant Ultreo, Inc. ("Ultreo"), creator and manufacturer of the Ultreo toothbrush. P&G contends that Ultreo has made false and misleading advertising claims with respect to the ultrasound component of the Ultreo toothbrush. Specifically, P&G alleges (1) false advertising in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(b); (2) deceptive trade practices in violation of New York's Deceptive Trade Practices Act, N.Y. G.B.L. §§ 349(a) and (h); (3) false advertising in violation of New York's false advertising statute, N.Y. G.B.L. §§ 350 and 350-a; and (4) common law claims of false advertising, unfair competition, and unfair business practices. P&G also seeks a preliminary injunction enjoining Ultreo from disseminating any "advertising, marketing, or promotional statements, whether made expressly or by implication, that the ultrasound feature of its toothbrush has any effect upon plaque removal or teeth cleaning, or that its ultrasound feature is magic or in any way falsely describing the nature of ultrasound

cycles."[1] (Compl. ¶ 55.) The Court held an evidentiary hearing on December 19-20, 2007, and January 10-11, 2008. The parties submitted proposed findings of fact and conclusions of law on February 1, 2008. The parties thereafter submitted supplemental letter briefs to the Court.

The issue raised in this litigation is whether Ultreo's advertising claims are false, either impliedly or expressly, because they are not supported by an *in vivo* human clinical study. Because P&G demands a preliminary injunction against Ultreo's advertising, the question now before the Court is whether P&G has proven that it is likely to suffer irreparable injury and that either there is a likelihood of success on the merits or sufficiently serious questions going to the merits so as to justify a preliminary injunction. For the reasons that follow, the Court concludes that P&G has failed to demonstrate irreparable harm, and accordingly denies the motion for a preliminary injunction.

I. BACKGROUND

A. The Parties and the Premium Power Toothbrush Market

P&G and Philips, which manufactures the Sonicare line of toothbrushes, are the two dominant competitors in the premium power toothbrush market. (Randall Decl. ¶ 5.) For the year ending August 2007, the rechargeable power toothbrush market was $111.6 million in all retail outlets in the United States. (*Id.* at ¶ 6.) Of this market, premium power toothbrushes, which include those priced over $60, accounted for $79.8 million of these sales. (*Id.*) Plaintiff P&G owns and distributes the Oral B line of toothbrushes, which includes a variety of power toothbrushes. (*Id.* at ¶ 5.) It controls 38.2% of the market for premium power toothbrushes. (*Id.* at ¶ 6.) Philips manufactures and distributes the Sonicare toothbrushes. (*Id.* at ¶ 5.) It controls 61.2% of the market for premium power toothbrushes. (*Id.* at ¶ 6.)

Defendant Ultreo is a new market entrant. It manufactures and sells one product — the Ultreo power toothbrush. (Gallagher Decl. ¶ 33.) The Ultreo power toothbrush combines ultrasound technology with sonic bristle action. (*Id.* at ¶¶ 9-11.) The Ultreo power toothbrush entered the market in 2007 and has no market share. Ultreo projects that the company will have $7 million in sales this year; it expects to lose $14 million. (*Id.* at ¶ 30.) The Ultreo toothbrush features high-speed sonic action bristles, which remove plaque and create bubbles. (*Id.* at ¶ 46.) A transducer located within the brushhead generates ultrasound waves, which are then directed via a waveguide into the fluid located around the bristle tips. (*Id.* at ¶ 9; Crum Decl. ¶ 14.) These ultrasound waves cause the bubbles in the fluid environment to oscillate (that is, to move rapidly) and pulsate (that is, to increase and decrease in size.) (Gallagher Decl. ¶ 9; Crum Decl. ¶ 10.) This process, known as cavitation, has been shown in laboratory tests to remove plaque bacteria

---

[1] In addition to seeking a permanent injunction on the same grounds as the preliminary injunction, P&G also seeks that Ultreo be ordered to "issue appropriate corrective advertising and literature," and that P&G be awarded, *inter alia*, Ultreo's profits derived from the "unlawful conduct," treble damages, costs, attorney's fees, and exemplary damages. (Compl. ¶ 56.)

from a simulated tooth surface. (Crum Decl. ¶¶ 12-15.) This cavitation process is similar to that by which ultrasound waves are used to clean jewelry, surgical equipment, and other objects. (*Id.* at ¶¶ 9-11.)

### B. The Advertising Claims

Ultreo advertises its product based in part on the ultrasound feature of the toothbrush. To this effect, Ultreo makes a series of claims in their advertising, website, infomercial, retail presentations, labeling on the Ultreo box, and presentations to dental professionals. P&G seeks to enjoin Ultreo from making the following claims (also described in Plaintiff's Exhibit 161).

First, P&G seeks to enjoin Ultreo from making claims that discuss bubbles and that allegedly suggest that the bubbles are able to remove plaque. (Pl.'s Exs. 59, 127A, 127C, 127F, 128.) For example, a current SkyMall listing for Ultreo states that "The sonic bristles create bubbles that pulsate at an exact ultrasonic frequency for optimal plaque removal." (Pl.'s Ex. 59.) Ultreo's website provides links to magazine articles that make claims that "the ultrasound technology creates tiny bubbles that blast away the plaque." (Pl.'s Ex. 127C.) Finally, Ultreo's infomercial contains images of bubbles pulsating in the mouth. (Pl.'s Ex. 128.)

Second, P&G seeks to enjoin Ultreo from making claims that discuss ultrasound and that allegedly attribute a cleaning or plaque-removal effect to the ultrasound component of Ultreo, whether alone or in combination with bristle action. For example, the Ultreo website includes the phrase, "the Ultimate Ultrasound Clean." (Pl.'s Ex. 127.) The infomercial includes the claim that while "[a] power toothbrush scrubs your teeth with brustle action, high speed bristle action . . . Ultreo does something else altogether, something more." (Pl.'s Ex. 128B at 19-20.)

Third, P&G seeks to enjoin Ultreo from making claims that Ultreo cleans or has an effect beyond the reach of actual toothbrush bristles. P&G points to a claim in a magazine article that was linked to the Ultreo website, which states that a "transducer in this device emits ultrasound waves, whipping your toothpaste into a pulsating froth of microscopic bubbles that penetrate under the gum-line and between teeth." (Pl.'s Ex. 127M.) P&G also points to language contained in a retail presentation by Ultreo that "specifically addressed the unique characteristic of [the Ultreo] cleaning the pits, fissures, interproximals . . . often where the bristles do not go — by the bubble action of the ultrasonic wave activation." (Pl.'s Ex. 51.)

Fourth, P&G seeks to enjoin Ultreo from making claims that connect the "feeling of clean" to the ultrasound or the bubbles. For example, Ultreo's packaging includes the claim that "Ultreo's bristles create microbubbles that are powerfully activated by nearly 4 million cycles of ultrasound energy per brushing channeled by a patented ultrasound waveguide. The result is an incredible, long-lasting feeling of clean." (Pl.'s Ex. 74.) Ultreo's website and infomercial contain substantively similar claims. (Pl.'s Ex. 128B at 13-14, 23.)

Fifth, P&G seeks to require Ultreo to disclose that "clinical studies show the ultrasound component of the Ultreo does not

remove plaque from the teeth," or words to that effect. (Pl.'s Ex. 161.)

Sixth, P&G demands that, in connection with presentations and conversations with dental professionals, Ultreo should be directed to provide "candid answers when asked about the absence of clinical studies." (Pl.'s Ex. 161.) Specifically, P&G asserts that Ultreo should state that "'clinical studies show that Ultreo's ultrasound component has no effect on plaque removal' or words to that effect." (*Id.*)

P&G's principal argument in support of these demands is that Ultreo's advertising relies on *in vitro* studies to support the claims. *In vitro* studies are studies conducted in a laboratory, rather than in the human mouth. P&G argues that Ultreo must provide *in vivo* support — that is, a clinical study of the toothbrush in the human mouth — to substantiate its advertising claims. P&G further argues that Ultreo's claims are disproven by both Ultreo and P&G's internal *in vivo* studies.

## II. STANDARD OF REVIEW

### A. Preliminary Injunction Standard

"A party seeking preliminary injunctive relief must establish: (1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, and (2) a likelihood of irreparable harm if the requested relief is denied." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007). These elements must be established by a preponderance of the evidence. *Shred-It, USA, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp. 2d 228, 233 (S.D.N.Y. 2002) (quoting *Addington v. Texas*, 441 U.S. 418, 423 (1979)); *see also Barrack, Rodos & Bacine v. Ballon Stoll Bader & Nadler, P.C.*, No. 08 Civ. 2152 (PKL), 2008 U.S. Dist. LEXIS 22026, at *11 (S.D.N.Y. Mar. 20, 2008); *S.E.C. v. Moran*, 922 F. Supp. 867, 889 (S.D.N.Y. 1996). A preliminary injunction is an "extraordinary remedy" that should not be routinely granted. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990). Whether injunctive relief should issue or not "'rests in the sound discretion of the district court.'" *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (quoting *Thornburgh v. Am. Coll. of Obstetricians and Gynecologists*, 476 U.S. 747, 755 (1986)).

A moving party must demonstrate that irreparable injury — the most important prerequisite for the issuance of a preliminary injunction — is likely before any other requirement for the issuance of an injunction may be considered. *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002); *see also Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) ("In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied.").

### B. False Advertising Law

The Lanham Act expressly forbids false or misleading descriptions or representations of fact concerning "the nature, characteristics, qualities, or geographic origin of . . . goods, services, or commercial activities." 15 U.S.C.

4

§ 1125(a)(1)(B).[2] To prevail on a false advertising claim under the Lanham Act, "a plaintiff must show that either: 1) the challenged advertisement is literally false, or 2) while the advertisement is literally true it is nevertheless likely to mislead or confuse consumers." *Johnson & Johnson\*Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992); *see also Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997); *McNeil-PPC, Inc. v. Pfizer Inc.*, 351 F. Supp. 2d 226, 248 (S.D.N.Y. 2005). Plaintiffs may also show that the claim is false by necessary implication. *See DIRECTV, Inc.*, 497 F.3d at 158. Under the plain language of section 43(a), any person who believes that he or she is or is likely to be damaged by the false or misleading representations may bring suit under the Lanham Act. *See Societe des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 130 (2d. Cir. 2004) ("We have consistently held that where the defendant has drawn a direct comparison between its own product and that of the plaintiff, we are inclined, without much more, to find standing to bring Lanham Act claims.").

Section 43(a) requires a showing of materiality — that is, "the plaintiff must also show that the defendants misrepresented an inherent quality or characteristic of the product." *S.C. Johnson & Son, Inc., v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) (citation omitted). In considering the issue of falsity, the court should "'consider the advertisement in its entirety and not . . . engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately.'" *Avis Rent A Car Sys., Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2d Cir. 1986) (quoting *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963)). "Text must yield to context." *Avis*, 782 F.2d at 385. Finally, the "visual images in a commercial" must also be considered in assessing falsity. *S.C. Johnson*, 241 F.3d at 238.

"Where the advertising claim is shown to be literally false, the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991) (citation and internal quotation marks omitted). In proving an advertising claim literally false, a plaintiff bears a different burden depending on whether the advertisement purports to be based on test results. Hence, where a defendant's advertisement contends that "clinical tests" prove the superiority of its product (an "establishment claim"), the plaintiff need only prove that "the tests referred to . . . were not sufficiently reliable to permit one to conclude

---

[2] The statute provides, in pertinent part, that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

with reasonable certainty that they established the proposition for which they were cited." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62-63 (2d Cir. 1992) (citation omitted). On the other hand, where a superiority claim does not purport to rest on test results, the plaintiff may prove falsity "'only upon adducing evidence' that affirmatively show[s] [defendant's] claim . . . to be false." *Id.* at 62-63 (citation omitted); *accord McNeil-P.C.C.*, 938 F.2d at 1549.

However, "[w]here a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers." *Johnson & Johnson\*Merck*, 960 F.2d at 297 (citations omitted). "It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive. . . [since] the question in such cases is — what does the person to whom the advertisement is addressed find to be the message?" *Id.* (citation omitted). "[T]he success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey" that shows that a substantial percentage of consumers are taking away the message that the plaintiff contends the advertising is conveying. *Id.* at 298 (citation omitted); *McNeil-PPC, Inc.*, 351 F. Supp. 2d at 248. Cases have held that 20% constitutes a substantial percentage of consumers. *See Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 n.14 (3d Cir. 1994) (citing cases finding "deception rates" of 20% or more to be sufficient). Survey results are useful and have "evidentiary value" if the surveys are properly designed and objectively and fairly conducted — for example, they employ "filters" to screen out individuals whose responses may distort the results; the questions are directed to "the real issues"; and the questions are not leading or suggestive. *Johnson & Johnson\*Merck*, 960 F.2d at 300; *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984).

After a plaintiff has established that a substantial number of consumers have taken away the purported message, the district court must then evaluate whether the message is false or likely to mislead or confuse, and may consider factors such as the commercial context, the defendant's prior advertising history, and the sophistication of the advertising audience. *See Johnson & Johnson\*Merck*, 960 F.2d at 298. Of course, the court must also consider the text and images used in the advertisement and the evidence offered to prove or disprove the truth of the asserted claim.

The plaintiff need not rely on consumer survey evidence to prove an implied falsity claim if the plaintiff "'adequately demonstrates that a defendant has intentionally set out to deceive the public,' and the defendant's 'deliberate conduct' in this regard is of an 'egregious nature.'" *Johnson & Johnson\*Merck*, 960 F.2d at 298-99 (quoting *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 140 (2d Cir. 1991)). In these circumstances, "a presumption arises 'that consumers are, in fact, being deceived.'" *Johnson & Johnson\*Merck*, 960 F.2d at 298-99 (quoting *Resource Developers*, 926 F.2d at 140).

"The federal standards applicable to false advertising claims are substantially similar to the standards applicable to claims under the New York deceptive trade practices statute." *Merck & Co. v. Mediplan Health Consulting*, 425 F. Supp. 2d 402, 410 n.6 (S.D.N.Y. 2006).

### III. DISCUSSION

Regardless of the likelihood of success on the merits, a plaintiff seeking a preliminary injunction must demonstrate "a likelihood of irreparable harm if the requested relief is denied." *DIRECTV, Inc.*, 497 F.3d at 152-53. First, the Court concludes that because P&G is not entitled to any presumption of irreparable harm, P&G must submit proof which provides a reasonable basis for believing that the false advertising will likely cause it injury. Second, the Court concludes that the evidence adduced in support of P&G's claim of irreparable injury does not meet this standard and is not sufficient to show that P&G will be irreparably harmed absent a preliminary injunction.

A. Legal Standard for Irreparable Harm

1. No Presumption of Irreparable Harm Applies

P&G argues that it is entitled to a presumption of irreparable harm. (Pl.'s Mem. 22-23.)[3] In those cases where the plaintiff has shown that defendant's comparative advertisement is literally false and mentions the plaintiff's product by name, the elements of injury and causation are presumed. *Castrol, Inc.*, 977 F.2d at 62. The elements of injury and causation are also presumed where the comparative advertisement makes it obvious to the viewing public that the advertisement is targeted at the plaintiff, even though the plaintiff is not identified by name. *DIRECTV, Inc.*, 497 F.3d at 148. "This presumption is not warranted, however, in cases where false comparative advertising is not at issue." *Telebrands Corp. v. Wilton Indus.*, 983 F. Supp. 471, 475 (S.D.N.Y. Nov. 6, 1997).

Here, P&G conceded that Ultreo's advertising claims are not comparative. (Tr. 830:6.) The advertising claims at issue (as detailed in Pl.'s Ex. 161) do not reference Oral B or any other toothbrush manufacturer or dental care product by name. Nor do the advertising claims make it obvious to the viewing public that the advertisement is targeted at the plaintiff. Accordingly, P&G is not entitled to a presumption of irreparable harm based on false comparative advertising.

A presumption of irreparable harm may also apply where the "false or misleading advertising claims create a danger to public health." *McNeilab, Inc. v. Am. Home Prods. Corp.*, 675 F. Supp. 819, 826 (S.D.N.Y. 1987). However, despite P&G's contention that Ultreo's advertising claims "are actively undermining the good dental health skills that all consumers should be practicing to avoid plaque and maintain good oral hygiene," (Pl.'s Mem. at 22), P&G adduced no evidence that the Ultreo or its advertising posed any danger to public health. By contrast, the

---

[3] "Pl.'s Mem." refers to the Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction, dated October 26, 2007. "Def.'s Mem." refers to the Defendant's Memorandum of Law in Opposition to the Procter & Gamble Company's Motion for a Preliminary Injunction, dated November 30, 2007.

7

record shows that the Ultreo is safe and effective in reducing and removing plaque. (McInnes Decl. ¶¶ 9-15; Berg Decl. ¶¶ 7-8; Pl.'s Mem. at 5.)

Finally, P&G submits that a presumption of irreparable harm is appropriate where "'the materiality of the false statement coupled with the unique nature of the product is likely to cause the consumer to buy the falsely advertised product instead of its competitor's product'." (Pl.'s Mem. at 22-23 (*quoting Telebrands*, 983 F. Supp. at 475). P&G misstates the law; *Telebrands* does not establish any such presumption. Rather, *Telebrands* simply states the proposition that irreparable harm may result from this situation: it says nothing about eliminating or otherwise reducing the burden of proving irreparable harm. *See Telebrands*, 983 F. Supp. at 475. Indeed, *Telebrands* explicitly distinguishes between false comparative advertising cases, which warrant a presumption of irreparable harm, and cases in which "the unique nature of the product is likely to cause the consumer to buy the falsely advertised product instead of its competitor's product," which do not give rise to a presumption. *Id.* Far from establishing that those circumstances give rise to a presumption, *Telebrands* simply suggests that if those circumstances are present in a given case, false advertising can produce irreparable harm. P&G's characterization of *Telebrands* as establishing a *presumption* of irreparable harm is clearly unsupported by the law. Indeed, no case supports P&G's contention that *Telebrands* established a presumption of irreparable harm in these circumstances. *See, e.g.*, *Zeneca, Inc. v. Eli Lilly & Co.*, 1999-2 Trade Cas. (CCH) P72,603, at *112 (S.D.N.Y. 1999) (describing *Telebrands* without characterizing it as a presumption).

Accordingly, the Court concludes that P&G has failed to establish that it is entitled to any presumption of irreparable harm.

### 2. "Indication of Actual Injury and Causation" Is Required

Because P&G is not entitled to a presumption of irreparable harm, it must demonstrate that it will be irreparably harmed. *See Timex Corp. v. AAI.Fostergrant, Inc.*, 8 Fed. Appx. 94, 97 (2d Cir. 2001) ("In the absence of such a presumption, it was incumbent on [Plaintiff] to present evidence that [Defendant's] marketing . . . during the pendency of this action would cause it irreparable injury."). "The rule in this Circuit, therefore, is that a plaintiff 'must submit proof which provides a reasonable basis' for believing that the false advertising will likely cause it injury." *DIRECTV, Inc.*, 497 F.3d at 161 (quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 316 (2d Cir. 1982)).

P&G argues that the "standard is not onerous" and that it has adduced sufficient evidence in the form of consumer surveys and other data to satisfy its burden. (Pl.'s Pr. Findings at ¶ 78.)

Because "[i]t is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement," a plaintiff "need not . . . point to an actual loss or diversion of sales" to satisfy this requirement. *Coca-Cola Co.*, 690 F.2d at 316. At the same time, "something more than

a plaintiff's mere subjective belief that [it] is injured or likely to be damaged is required before [it] will be entitled even to injunctive relief." *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980). In general, "[t]he likelihood of injury and causation will not be presumed, but must be demonstrated in some manner." *Coca-Cola Co.*, 690 F.2d at 316. Finally, "injunctive relief is not barred just because the possibility that the total pecuniary harm might be relatively slight." *McNeil-PPC, Inc. v. Pfizer Inc.*, 351 F. Supp. 2d at 247.

Accordingly, to meet the requirement that a plaintiff submit proof providing a reasonable basis for believing that the false advertising will likely cause it injury, the law requires "some indication of actual injury and causation" — enough to "ensure [that the] plaintiff's injury [is] not speculative." *McNeilab, Inc. v. Am. Home Products Corp.*, 848 F.2d 34, 62 (2d Cir. 1988); *see also SQP, Inc. v. Sirrom Sales, Inc.*, 130 F. Supp. 2d 364, 367 (N.D.N.Y 2001). The "likelihood of injury and causation . . . must be demonstrated in some manner." *DIRECTV, Inc.*, 497 F.3d at 161 (citation omitted). In *Carter-Wallace,* the Second Circuit required that the plaintiff show "a logical causal connection between the alleged false advertising and its own sales position." 631 F.2d at 190.

B. Analysis of P&G's Claim of Irreparable Injury

P&G's claim for irreparable injury is based on the argument that the introduction of the Ultreo will cause P&G to lose sales. (Pl.'s Pr. Findings at ¶ 77.)[4] In support of this contention, P&G raises two arguments. First, it argues that the consumer analysis done by Coulter-Renken demonstrates that the introduction of Ultreo will adversely affect the sales of P&G's high-end toothbrushes. (Pl.'s Mem. at 24.) Second, it argues that a substantial percentage of consumers are being misled. (Pl.'s Mem. at 23.) The Court concludes that this evidence fails to show a logical causal connection between the alleged false advertising and P&G's own sales position. Moreover, the Court concludes that the alleged injury is quantifiable, that P&G's delay weighs against finding irreparable harm in these circumstances, and that both P&G and the market leader, Philips, engage in conduct identical to that challenged by P&G in this action. Accordingly, the Court concludes that P&G has failed to make out the requisite showing of irreparable harm.

1. The Coulter-Renken Study

The Court first turns to the Coulter-Renken Study. The Coulter-Renken Study was conducted by Coulter-Renken, a consulting firm, at the behest of P&G. (Randall Aff. ¶ 23; Pl.'s Ex. 9.) The Coulter-Renken Study found that Ultreo is expected to launch with the sale of 66,000 toothbrushes, over 50% of which would come at the expense of its competitor, Oral-B. (Randall Aff. ¶ 23.) Initially, P&G argued that these lost sales constituted the full measure of P&G's damages, thereby establishing irreparable harm. (*Id.*)

---

[4] "Pl.'s Pr. Findings" refers to Plaintiff's Proposed Findings of Fact and Conclusions of Law, submitted post-hearing on February 4, 2008.

9

However, this evidence is not, alone, enough to show that P&G will suffer irreparable injury. In meeting its burden, P&G must distinguish between the lost sales it believes it would experience from lawful competition and truthful advertising from the lost sales it believes it would experience from the alleged false advertising. *See Carter-Wallace*, 631 F.2d at 190 (requiring that plaintiff show "a logical causal connection between the alleged false advertising and its own sales position"). The Coulter-Renken Study does not differentiate between sales lost due to false advertising and sales lost due to healthy market competition. None of the allegedly offending ads were shown to the respondents in the Coulter-Renken Study. Instead, the Coulter-Renken Study is simply an estimate of the extent of Ultreo's first year sales and the effect of the market entry on P&G sales, without factoring in any false or misleading advertising. (Pl.'s Ex. 6, ¶5; Tr. 57:3-13; Tr. 559:25-560:7; Tr. 596:9-14.) Accordingly, P&G cannot rely on this data to demonstrate irreparable harm due to alleged false advertising.

Perhaps recognizing this fact, P&G subsequently turned an about-face just prior to the preliminary injunction hearing, and now argues that the Coulter-Renken Study provides an estimate of lost sales from *lawful* competition from Ultreo. According to P&G's new theory, any actual sales achieved by Ultreo in *excess* of the Coulter-Renken estimate represent P&G's lost sales from false advertising. (Randall Supp. Decl. ¶ 8; Pl.'s Pr. Findings at ¶55 ("Since Ultreo's sales exceed the Coulter-Renken estimate, it is reasonable to conclude that Ultreo's false and misleading advertising has contributed to its sales.").) At the preliminary injunction hearing, Wayne Randall, Vice President and Brand Franchise Leader for P&G's Global Oral Care business, speculated that of the 100,000 units which Ultreo's CEO, Jack Gallagher, testified that Ultreo hoped to sell in its first year, 66,000 of those units would result from lawful competition and 34,000 would result from false advertising. (Tr. 60:9-12.) Of those 34,000 units sold, Randall stated that half would displace Oral-B toothbrush sales. (Tr. 60:13-61:1.) Accordingly, he estimated that the lost sales to P&G were in the range of 17,000 units.

This analysis, however, is fundamentally flawed, because there is virtually no evidence that establishes a logical causal connection between the alleged false advertising and P&G's claims of lost sales. The fact that Ultreo's actual sales may have exceeded the Coulter-Renken estimate, or even that Ultreo's sales may have exceeded Ultreo's own estimates, as P&G argued, does not mean that the overage is the result of false advertising. Indeed, the Coulter-Renken estimate does not take the allegedly false advertising into consideration at all. (*See* Tr. 572-75.) To state the obvious, the estimate in the Coulter-Renken Study could simply have been too low, or Ultreo could simply have performed better than expectations for reasons wholly unrelated to the advertising claims — a fact which P&G conceded. (Tr. 835:4.) This is a likely possibility, given that the Coulter-Renken Study failed to provide consumers with commercially meaningful price points in the product comparisons. (Tr. 561:21-563:3.)

If that were not enough, the Coulter-Renken Study also failed to account for differences in distribution channels utilized by

Ultreo. (Tr. 565-566.) Notably, the Coulter-Renken Study failed to take into account the difference between trial units — which are sales to dental professionals at deeply discounted prices — and retail sales. Mr. Gallagher testified that of the 100,000 sales that he estimates Ultreo will make in its first year, 40,000 to 45,000 of those sales will be trial unit sales to dental professionals. (Tr. 419, 422-23; Gallagher Supp. Decl. Ex. A; Def.'s Ex. 195.) Mr. Randall conceded that it cannot be said that these sales would displace P&G sales. (Tr. 62-63.) Under these circumstances, the Coulter-Renken Study did not provide the Court with any nexus between Ultreo's allegedly false advertising and P&G's lost sales. Absent such a nexus, the Court cannot conclude that P&G has a reasonable belief that it will be irreparably injured. To the contrary, the Court can conclude only that when faced with a new market entrant, P&G is likely to lose some sales. Such a loss, absent a nexus or a logical connection to false advertising, is insufficient to demonstrate the irreparable harm required to issue a preliminary injunction.

Finally, the Court notes its concern that the Coulter-Renken Study does not provide adequate information about its survey sample. In determining the evidentiary value of a survey, courts examine whether: "'(1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured.'" *Vista Food Exch., Inc. v. Vistar Corp.*, No. 03-CV-5203 (DRH) (WDW), 2005 U.S. Dist. LEXIS 42541, at *14 (E.D.N.Y. Sept. 27, 2005) (quoting *Toys 'R' Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983)); *see also Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir. 1999) (endorsing these factors in assessing survey reliability); *Malletier v. Dooney & Bourke, Inc.*, 340 F. Supp. 2d 415 (S.D.N.Y. 2004) (applying some of these factors); *Manual for Complex Litigation, Fourth* §11.493 (2007) (discussing similar factors in assessing the value of survey evidence).

The Coulter-Renken Study is based on a sample of 3,116 internet survey respondents. However, the study itself does not provide any indication of how this sample was selected. (Rao Decl. ¶ 17.) There is no indication of whether the universe from which these respondents were chosen was a properly defined universe, or whether the 3,116 respondents constituted a representative sample of that universe. Without any information as to the composition and selection methodology of the survey sample, the Coulter-Renken Study is simply not probative of irreparable injury. *See Vista Food Exch., Inc.*, 2005 U.S. Dist. LEXIS 42541, at *18-19 (holding that survey with improperly defined sample was not probative).

For all of these reasons, the Court finds that the Coulter-Renken Study did not establish "a logical causal connection between the alleged false advertising and [plaintiff's] own sales position," *Carter-Wallace*, 631

F.2d at 190, and thus that it is insufficient to provide "a reasonable basis for believing that the false advertising will likely cause [plaintiff] injury," *DIRECTV, Inc.*, 497 F.3d at 161.

2. The Dupont Survey, IPSOS Study, and BASES Study

P&G argues that the evidence shows that a substantial percentage of consumers are being misled, thus providing P&G with a reasonable basis to believe that the false advertising will cause it injury. (Pl.'s Mem. at 23.) First, P&G points to a survey conducted by Dr. Thomas Dupont entitled "Consumer Perception of Ultreo Advertising Claims" (the "Dupont Survey"). Second, P&G cites two studies that were commissioned by P&G to assess the market impact of the Ultreo toothbrush — the IPSOS Study (Pl.'s Ex. 10), and the Snapshot of BASES Concept Test — Ultreo (the "BASES Study") (Pl.'s Ex. 11.) P&G contends that these studies support its argument that Ultreo's claims of ultrasound cleaning and a "beyond the bristles" effect were compelling to consumers and dental professionals alike. (Pl.'s Ex. 10 at 4227-30; Tr. 59:9-15.) Specifically, P&G submits that the Dupont Survey showed that these claims were material to consumers and likely to cause consumers to buy the Ultreo product. ((Pl.'s Mem. at 23; Pl.'s Ex. 3, Ex. A.) P&G also argues that the Dupont Survey, taken together with, *inter alia*, the IPSOS study and the BASES Study, substantiate P&G's claim that any Ultreo sales above the Coulter-Renken estimate of 66,000 support the inference that the sales are the result of false advertising. (Tr. 59:10-15; Randall Supp. Decl. ¶ 8.)

The "probative value of a consumer survey is a highly fact-specific determination and a court may place such weight on survey evidence as it deems appropriate." *Johnson & Johnson-Merck Consumer Pharms. Co.*, 19 F.3d at 134 (citation omitted). In this case, the Court finds that the Dupont Survey — upon which P&G relies for the proposition that consumers are being misled by Ultreo's advertisements — is deeply flawed.

First, the Dupont Survey did not employ a control group, which would have allowed a researcher to distinguish between pre-existing consumer beliefs about ultrasound and "bubbles" and consumer beliefs that were the result of Ultreo's advertising. (*See* Tr. 221-22; Wind Decl. ¶ 6.) "Controls are an essential feature of reliable survey evidence because they enable the surveyor to separate the wheat (the effect of the advertisement, alone, on the participant) from the chaff (the effect of the participant's prior knowledge and/or prior (mis) conceptions)." *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, 601 (D.N.J. 2003) (internal quotation marks and citation omitted) (rejecting consumer survey where Dr. Dupont did not adequately control for consumers' preexisting beliefs). Dr. Dupont testified that he did not use a control group in this case because he did not think that there were any pre-existing beliefs as to the efficacy of "bubbles" and/or ultrasound in the oral health care marketplace. (Tr. 194-96.) He based this opinion on information provided by P&G's counsel, but conducted no research to determine whether there might be preexisting beliefs about the relevant product features. (Tr. 200.) In contrast, Ultreo introduced numerous examples of advertisements relating to the cleaning

potential of bubbles with respect to both toothpastes and toothbrushes. (Tr. 412-18; Def.'s Exs. 14, 181-85.) Furthermore, several of the responses to the Dupont Survey reveal that respondents did in fact have preexisting beliefs concerning both ultrasound and bubbles. (Tr. 195:12-198:18.) Accordingly, it is not possible for the Court to distinguish between consumers who would buy any ultrasound toothbrush because they have heard of ultrasound technology or other aspects of the Ultreo in other contexts (*see, e.g.*, Def.'s Exs. 14, 105 at PG 000079-81, 181-85), and those who would purchase the toothbrush based solely on Ultreo's advertising. The evidence adduced at the hearing points directly to the importance of a control group to eliminate the effect of pre-existing beliefs. For these reasons, the Court credits Dr. Yoram Wind's testimony that without a control, one cannot rely on the results of the study for any purpose. (Wind Decl. ¶ 6.)

Other aspects of the Dupont Survey were likewise flawed. First, it used "filter questions" that were in fact leading questions. "A survey is not credible if it relies on leading questions which are inherently suggestive and invite guessing by those who did not get any clear message at all." *Johnson & Johnson-Merck Consumer Pharms. Co.*, 19 F.3d at 134 (citation omitted); *accord P&G Pharms., Inc. v. Hoffmann-La Roche, Inc.*, No. 06 Civ. 0034 (PAC), 2006 U.S. Dist. LEXIS 64363, at *86 (S.D.N.Y. Sept. 6, 2006). The Dupont Survey used inappropriate leading questions, which caused respondents to focus on ultrasound even if they did not recall anything about ultrasound from the advertising. (Wind Decl. ¶ 9.) These included questions such as "What does the ultrasound do?" and "What is the benefit of ultrasound?" (Dupont Decl. Exh. A, at 15-17.) Second, the Dupont Survey also showed respondents advertising materials that were substantially altered, as well as advertising materials that are no longer being used by Ultreo. (*Id.* at ¶ 8.) Accordingly, the Court cannot conclude from this study how consumers would react to the actual live ad on Ultreo's website. Finally, the Dupont Survey inappropriately conflated survey responses that referred to sonic vibrations and ultrasound. (*Id.* at ¶ 12; Tr. 183:8-10.) This is material because Dr. Dupont concluded that many consumers believe that ultrasound and ultrasound bubbles are able to clean teeth. (Dupont Decl. Exh. A., at 9.) However, an analysis of the actual responses to the survey indicate that many respondents did not perceive the ultrasound alone to clean teeth. (Wind Decl. ¶ 12.) Given these deficiencies in the Dupont Survey, the Court rejects it as a basis to conclude that Ultreo's allegedly false advertising is likely to mislead consumers and thus constitute irreparable harm.

With respect to the BASES Study and the IPSOS Study, the Court finds P&G's analysis to be wholly conclusory and inadequate to provide P&G with the "reasonable belief" required by law. For the reasons enumerated above, there are many reasons why Ultreo's actual sales could be greater than the Coulter-Renken estimate. Furthermore, the studies that P&G cites do not distinguish between the challenged advertising and unchallenged advertising, nor do they provide a causal nexus between the allegedly false advertising and sales potentially lost by P&G. The law requires "some indication of actual injury and causation" — enough to "ensure [that the] plaintiff's injury [is] not speculative."

*McNeilab, Inc. v. Am. Home Products Corp.*, 848 F.2d 34, 62 (2d Cir. 1988). To the extent that the IPSOS and BASES Studies suggest that Ultreo's advertising was powerful, they are nevertheless insufficient to establish the required "logical causal connection between the alleged false advertising and [P&G's] own sales position." *Carter-Wallace*, 631 F.2d at 190.

3. The Alleged Injury is Quantifiable

Even assuming *arguendo* that the Coulter-Renken Study, together with P&G's other evidence, constituted a reasonable basis for P&G's belief that the allegedly false advertising would likely cause it injury, the harm claimed by P&G in this case is easily quantifiable and, therefore, does not warrant injunctive relief. It is well established in the Second Circuit that to obtain a preliminary injunction, the "movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (quotation marks and citation omitted). Indeed, the Second Circuit has articulated the "general proposition that irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial." *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995); *see also Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 763 (2d Cir. 1979) (finding no irreparable harm where the facts demonstrate no loss of goodwill, but only provable monetary damages from the loss of a profitable line of business); *Iron Mt. Info. Mgmt. v. Taddeo*, 455 F. Supp. 2d 124, 132 (E.D.N.Y. 2006) ("A preliminary injunction is not appropriate where monetary damages will serve as adequate compensation."); *Marisa Christina, Inc. v. Freis*, 646 F. Supp. 252, 254 (S.D.N.Y. 1986) (finding no irreparable harm where plaintiff conceded that "any injuries stemming from the termination of the licensing agreement could be readily quantified in terms of money damages"). This general principle also applies in false advertising cases. *See IDT Telecom, Inc. v. CVT Prepaid Solutions, Inc.*, 250 Fed. Appx. 476, 479 (3d Cir. 2007) (affirming district court's denial of preliminary injunction in false advertising case because a "preliminary injunction should not be granted if the injury suffered by the moving party can be recouped in monetary damages"); *Twentieth Century Fox Film Corp. v. Marvel Entm'ts*, 277 F.3d 253, 260 (2d Cir. 2002) (affirming denial of preliminary injunction for lack of irreparable harm where allegations of irreparable harm are based on quantifiable estimates of lost profits)

By contrast, courts have granted preliminary injunctions based on evidence that plaintiffs are being irreparably harmed because they are losing market share. *See, e.g.*, *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d at 317 (likelihood of lost market share); *S.C. Johnson & Son, Inc. v. Clorox Co.*, 930 F. Supp. 753, 786 (E.D.N.Y. 1996) (lost market share); *Novartis Consumer Health, Inc., v. Johnson & Johnson*, 290 F.3d 578, 595-96 (3d Cir. 2002) (loss of market share constitutes irreparable harm.)

P&G claims lost profits from lost sales, and contends that it can identify those lost sales with a reasonable degree of precision. Indeed, those lost sales can be assessed with some simple chalkboard math, as was

demonstrated in the preliminary injunction hearing. (Tr. 60-64.) By contrast, by its own concession, P&G presented no evidence of lost market share or price erosion — damages that would be more difficult to quantify. (Tr. at 72:9-14.) Given the enormous disparity between P&G and Ultreo in market share and advertising expenditures, and in light of the estimates of the number of Ultreo units that will be sold in Ultreo's first year, it seems unlikely that P&G could adduce reliable evidence of lost market share as a result of competition from Ultreo. *See, e.g.*, *Creative Labs, Inc. v. Mad Dog Multimedia, Inc.*, No. 02-Civ-4575, 2002 WL 32068970, at *3 (N.D. Cal. Oct. 3, 2002) ("substantial disparity" in market shares undermines showing of irreparable harm). Nor, given the fact that the Ultreo toothbrush is priced substantially higher than the highest-priced P&G product, could P&G adduce evidence of price erosion. (Tr. 72:12-19.) In the absence of such evidence, all that remains are P&G's lost sales — which are easily quantifiable at trial and can be remedied with money damages.

### 4. P&G's Delay Weighs Against Finding Irreparable Harm

Equitable considerations further weigh against a finding of irreparable harm in these circumstances.[5] The Court notes that despite first complaining about Ultreo's advertising in March 2007, P&G delayed for six months prior to commencing this action. (Levy Decl. ¶¶ 3-15; Gallagher Decl. ¶¶ 24-27.) "[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276-77 (2d Cir. 1985) (internal quotation marks and citation omitted) (delay of ten weeks suggests no irreparable injury). "As a factual matter, such delay suggests that irreparable harm does not exist as the moving party, for some significant period of time, declined to exercise rights that may have mitigated the irreparable harm it was suffering." *Schick Mfg. v. Gillette Co.*, 372 F. Supp. 2d 273, 284 (D. Conn. 2005). However, a short delay does not weigh against irreparable harm "where there is good reason for it, as when a plaintiff is not certain of the infringing activity or has taken additional time to examine the infringing product." *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144-45 (2d Cir. 2005).

Courts have refused to grant preliminary injunctive relief where a party's delay in bringing suit was far shorter than the six months present in this case. For example, in *Magnet Communications LLC v. Magnet Communications, Inc.*, No. 00 Civ. 5746, 2001 WL 1097865, at *1 (S.D.N.Y. Sept. 19, 2001), the court held that a delay of twelve weeks weighed against a finding of irreparable harm. Similarly, in *ImOn, Inc. v. ImaginOn*, Inc., 90 F. Supp. 2d 345, 350 (S.D.N.Y. 2000), the court determined that a delay of eighteen weeks weighed against a finding of irreparable harm. Likewise, in *The Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989),

---

[5] The Court makes no conclusion as to whether this action is barred by laches, which is relevant only to permanent relief. *See Tom Doherty, Inc. v. Saban Ent'mt, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) ("Delay is typically relevant to both irreparable harm and to laches, although the latter doctrine relates only to permanent relief.").

15

the court concluded that a delay of three months weighed against a finding of irreparable harm.

Accordingly, P&G's six-month delay in seeking injunctive relief, while not itself dispositive, weighs strongly against a finding of irreparable harm. The Court particularly notes that P&G failed adequately to explain the reason for the delay, and that there is some evidence to suggest that P&G timed their public disclosure of this litigation to coincide with the American Dental Association's annual meetings, held in September 2007. (Gallagher Decl. ¶ 27 and Ex. D.) On the basis of the facts adduced during the hearing, the Court thus concludes that P&G has failed to demonstrate irreparable harm in this matter.

### 5. Comparable Advertising by P&G and Philips Further Weighs Against Finding of Irreparable Harm

Finally, P&G cannot claim that it will be irreparably harmed by Ultreo's advertising when both Philips and P&G have made comparable claims to those challenged by P&G here — namely, claims based on *in vitro* laboratory studies. The equitable doctrine of "unclean hands" "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The unclean hands doctrine will be applied "only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933). Here, the Court makes no finding as to whether claims based on *in vitro* laboratory studies are, in fact, false or unconscionable. Nevertheless, assuming *arguendo* that P&G were to prevail on its claim that *in vitro* support is insufficient, P&G has engaged in virtually identical advertising in the past. Specifically, P&G made advertising claims about its own oral care products based solely on laboratory studies; has extolled the benefits of "beyond-the-bristles cleaning" as shown in laboratory studies; and regularly makes "feeling of clean" advertising claims (Gallagher Dir. ¶ 45; Def.'s Exs. 10-12; McInnes Dir. ¶ 19-20; Def.'s Ex. 37).

Specifically, in 2004, P&G and Philips jointly launched a product that combined a Sonicare toothbrush with a Crest brand toothpaste dispenser inside the brush, known as the "IntelliClean System." (Def.'s Ex. 37.) In connection with this launch, P&G and Philips jointly disseminated a compendium of clinical and laboratory research regarding the product (the "Compendium"). The Compendium includes several articles authored by P&G scientists that state that the Sonicare toothbrush has been proven to remove plaque bacteria "beyond the bristles." For example, one of the articles indicated that:

> Sonicare technology has been shown to remove biofilm bacteria beyond the reach of the bristles. The rapid motion of the Sonicare bristles activates fluid surrounding the brush head, forcing it into regions the bristles do not contact. This fluid motion effects biofilm removal.

(*Id.* at 49.)

Significantly, the supporting citations refer to *in vitro* laboratory studies that are virtually identical in design to Ultreo's *in vitro* study. (*Id.*; Berg Decl. ¶¶ 24-25; McInnes Decl. ¶¶ 21-28.) Similarly, the lead article in the Compendium, co-authored by a P&G Senior Scientist, explains that the standard Sonicare toothbrush "creates dynamic fluid activity in the mouth," and that "[a]ccording to *in vitro* studies . . . such fluid activity can remove plaque from beyond the reach of the bristles significantly better than a rotational-oscillation power toothbrush." (Def.'s Ex. 37, at 5.) The Compendium makes additional beyond-the-bristles claims based on *in vitro* data. (*See, e.g.*, Def.'s Ex. 37, at 7, 8, 22, and 16.)

At the preliminary injunction hearing, Dr. Aaron Biesbrock testified for P&G that "in IntelliClean, there was clearly a body of evidence that Philips had used historically to support *in vitro* claims of 'cleans beyond-the-bristles." (Tr. 162:10-12.) Yet despite Dr. Biesbrock's statement that P&G was "not comfortable with" the *in vitro* beyond-the-bristles claims, it is undisputed that those concerns were never reflected in the Compendium. (Tr. 163:18-20.) Notably, the Compendium never states that results of laboratory studies must be corroborated by *in vivo*, clinical studies. Accordingly, at a time when P&G's commercial interests were different, P&G made the very same claims that it now attacks as false, and relied on the very science it now claims is inadequate.

In addition, Philips, the leader in this market, has made and continues to make beyond-the-bristles claims directed at dental professionals and consumers based exclusively on *in vitro* laboratory studies. (Berg Dir. ¶¶ 20-22; McInnes Dir. ¶¶ 15, 18-28; Def.'s Ex. 14; Def.'s Ex. 154K; Def.'s Ex. 186.) In October 2007, after this lawsuit was filed, Philips distributed a brochure directed to consumers that states "Powered by our patented sonic technology, Sonicare cleans beyond-the-bristles to remove plaque deep between the teeth and along the gumline." (Def.'s Ex. 14.) In addition, Philips' current website is replete with beyond-the-bristles claims directed at both consumers and dental professionals, made on the basis of *in vitro* biofilm removal tests. (Def.'s Ex. 186.) P&G's witnesses, Doctors Aaron Biesbrock and Robert Genco, conceded that the support for Philips' beyond-the-bristles claims were based solely on *in vitro* studies. (Tr. 767-770; 254:13-18.) Significantly, neither Philips nor P&G included any type of qualifier to the beyond-the-bristles claims to consumers or dental professionals.

In light of these facts, it is clear that the allegedly false advertising would ensure detriment to all competitors. *See SQP, Inc.*, 130 F. Supp. 2d at 369. P&G is no more likely to suffer harm from such advertising than would any other competitor — including Ultreo. In these circumstances, it would be unreasonable to conclude that Ultreo — a newcomer to the stage with very modest sales — must be enjoined from making the very same claims that the market giants — Philips and P&G — have made for years. Indeed, it seems evident that P&G's litigation strategy in this case is simply an attempt to keep Ultreo in the starting blocks. *See, e.g.*, *P&G Pharms., Inc.*, 2006 U.S. Dist. LEXIS 64363, at *4 (noting that P&G's attempt to obtain a preliminary injunction against allegedly false pharmaceutical advertising was part of a "marketing war" in a market that was both

"large and lucrative" and concluding that the Court would decline "to intervene in the on-going marketing battle"). It is abundantly clear that in 2004, P&G engaged in conduct identical to that which it now decries. Having availed itself of beyond-the-bristles claims based on *in vitro* laboratory studies at a time when it benefited P&G's commercial interests to do so, P&G may not now claim to be irreparably harmed when a new market entrant takes the same position it once did.

Having concluded that P&G has failed to meet its burden of demonstrating "a likelihood of irreparable harm if the requested relief is denied," *DIRECTV*, 497 F.3d at 152-53, the Court need not consider the likelihood of success on the merits or the balance of the equities.

IV. CONCLUSION

For the foregoing reasons, P&G's motion for a preliminary injunction is hereby DENIED. The Clerk of the Court is respectfully requested to terminate the motion located at document number 17.

Plaintiff The Procter & Gamble Company is represented by Harold Keith Gordon, Esq., Theresa M. Gillis, Esq., and Laura W. Sawyer, Esq., Jones Day, 222 East 41st Street, New York, New York 10017; and Danielle M. Hohos, Esq., and John B. Williams, Esq., 51 Louisiana Avenue Northwest, Washington, D.C., 20001. Defendant Ultreo, Inc., is represented by Anthony DiSarro, Esq., and Lina M. Viviano, Esq., Winston and Strawn LLP, 200 Park Avenue, New York, New York 10166; Kimball Richard Anderson, Esq., Lisa J. Parker, Esq., and Stephen P. Durchslag, Esq., Winston and Strawn LLP, 35 West Wacker Drive, Chicago, Illinois 60601; and Marc C. Levy, Esq., Faegre & Benson LLP, 3200 Wells Fargo Center, 1700 Lincoln Street, Denver, Colorado 80203.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: August 28, 2008
New York, New York

\*\*\*